**In re Kenneth H. BERNSTEIN, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 99–BG–1440.**

District of Columbia Court of Appeals.

Argued Jan. 23, 2001.

Decided June 7, 2001.

See also, 707 A.2d 371.

---

Kenneth H. Bernstein, pro se.

Ross T. Dicker, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before STEADMAN and SCHWELB, Associate Judges, and KERN, Senior Judge.

SCHWELB, Associate Judge:

The Board on Professional Responsibility (BPR or the Board) has recommended that Kenneth H. Bernstein, a member of our Bar since 1975, be suspended from practice for nine months for charging an unreasonable fee, for commingling, and for engaging in conduct involving dishonesty. The Board has further proposed that Bernstein's reinstatement be conditioned, *inter alia*, on his payment of restitution, with interest, to a former client, and on Bernstein's completion of a Continuing Legal Education course on professional responsibility. Bernstein has raised numerous objections to the Board's report and recommendation. With a single minor exception,[1] we impose the discipline recommended by the Board.

## I.

## THE FACTS[2]

This case arises out of a workers' compensation claim that Bernstein filed with the Industrial Commission of Virginia (the Commission) more than ten years ago. Bernstein's client in that matter, John D. Smith, claimed to have suffered injuries to his back while employed in Virginia. Bernstein was not a member of the Virginia Bar, but he associated himself, for purposes of the representation, with an attorney who was admitted to practice in that jurisdiction.

In May 1992, Bernstein negotiated a settlement on Smith's behalf with the employer's attorney. Under the terms of the settlement, the employer was to pay Mr. Smith a total of $30,000. After securing his client's approval, Bernstein prepared, and Smith executed, a "Legal Services and Settlement Allocation Agreement" which provided that $9,000 of the $30,000 would be paid to Bernstein.

Under Virginia law, Bernstein's fee was subject to the approval of the Commission. On June 8, 1992, Bernstein wrote a letter to the Commission requesting approval of a fee "in the amount of 25% of the settlement amount," or $7,500. Bernstein noted in his letter that his client had agreed to the proposed fee.

In July 1992, the Commission rejected Bernstein's request for a fee of $7,500, and instead awarded him a total of only $4,000 for representing Mr. Smith. Bernstein later complained that the Commission's award represented "a 60% pay cut from his original agreement" with his client.[3]

---

1. The Board has also suggested, as a third condition of reinstatement, that Bernstein be required to certify that he has read the District of Columbia Bar's "Voluntary Standards of Civility in Professional Conduct." For reasons set forth in Part IV D, *infra*, we decline to impose this condition.

2. Our factual recitation is a distillation of the far more comprehensive findings of Hearing Committee Number Eleven, which were

adopted by the Board with only minor changes.

3. Bernstein did not inform his client that he was asking the Commission to increase his fee. Such a request, if granted, would, of course, reduce the client's ultimate share of the total recovery. Mr. Smith therefore had an obvious interest in being apprised of a request by his attorney for a larger share of the $30,000 award.

Bernstein again requested the Commission to award him a fee of at least $7,500, and he stated that he was absorbing "$1,000 of what otherwise would be expenses of the client." On September 17, 1992, the Commission approved the settlement of $30,000, increased Bernstein's initial award by 50%, and directed that $6,000 be deducted from the total award and paid to Bernstein for his representation of Mr. Smith.

Although the Commission's revised fee award represented a substantial increase over the amount originally awarded, Bernstein apparently regarded it as unlawful and confiscatory. In any event, Bernstein ignored the Commission's decision. After receiving a check pursuant to the settlement,[4] Bernstein retained $9,000, rather than $6,000, for himself. Notwithstanding his fiduciary obligation vis-a-vis his client, Bernstein did not inform Mr. Smith that the Commission had approved only $6,000

as Bernstein's compensation.[5] Smith had previously been provided with documents revealing that it was the Commission's responsibility to designate the amount of Bernstein's fee.[6] Under these circumstances, in the absence of information to the contrary from Bernstein, Smith could reasonably assume that any fee deducted by Bernstein from the proceeds of the settlement had been approved by the Commission.[7]

On October 5, 1992, upon receiving the settlement check, Bernstein deposited it in his business checking account at a local bank. Bernstein also maintained his own funds in this account. Thus, for a brief period, settlement funds belonging to Mr. Smith, as well as moneys owed to medical providers, were commingled with funds belonging to Bernstein. On October 13, 1992, after the check had cleared, Bernstein disbursed to his client all but $480 of

---

4. The Commission authorized the issuance of a single check for $30,000 payable to Smith and Bernstein. Bernstein was to retain $6,000, and he was ordered to disburse all remaining settlement proceeds to his client, after deduction of any payments to medical providers.

5. In his brief in this court, Bernstein gave the following explanation of his failure to apprise his client that the Commission had awarded Bernstein only $6,000 (rather than the $9,000, as specified in the Compensation Agreement):

> Yes, it is true that I never informed Mr. Smith of the Richmond bureaucrat's outrageous 50–60% slashing of my hard-earned compensation for 18 months to two+ years of work. I felt then and now that this is unlawful, and that informing him of unlawful action regarding our contract would serve no positive purpose. I believed, and I still do, that this amounted to unconstitutional state action impairing a contract obligation.

(Citation omitted.)

At oral argument, Bernstein was asked whether, in light of his fiduciary responsibili-

ties to Mr. Smith, he (Bernstein) had the right to retain a fee greater than that authorized by the Commission without informing his client of the Commission's ruling regarding the fee. Initially no clear response was forthcoming. A member of the court then asked Bernstein whether his answer was 1. Yes; or 2. No; or 3. I don't know. Bernstein selected the third alternative.

6. In anticipation of the Commission's approval of the settlement, Mr. Smith signed an affidavit to the effect that he was "satisfied with the services of his attorney, for whom a fee for legal services will be approved by the Commission and deducted before payment of net settlement proceeds to the claimant."

7. Mr. Smith did not learn for several years that his attorney had taken a fee of $3,000 more than the amount authorized by the Commission. In 1996, an attorney from the Office of Bar Counsel discovered the discrepancy while reviewing documents relating to another disciplinary charge against Bernstein. The earlier charge resulted in a brief suspension of Bernstein from practice. *See In re Bernstein*, 707 A.2d 371 (D.C.1998) (*Bernstein I*).

the remaining settlement funds.[8] As previously noted, however, he retained $9,000 of the proceeds for himself.

## II.

### BERNSTEIN'S VIOLATIONS

■ On the basis of the facts summarized above, the Hearing Committee and the Board on Professional Responsibility both found, by clear and convincing evidence, that Bernstein had violated the following Rules of Professional Conduct:

| Rule 1.5(a) | Charging an excessive fee |
| Rules 1.15(a) and 1.17(a) | Commingling |
| Rule 8.4(c) | Dishonesty[9] |

Each of these violations is well established in the record.

It is undisputed that although the Commission awarded Bernstein only $6,000 for his fees and expenses, Bernstein retained $9,000. The retention of the increased fee was unlawful, and therefore unreasonable. *See In re Hudock*, 544 A.2d 707, 708 (D.C. 1988) (per curiam); *see also Hudock v. Va. State Bar*, 233 Va. 390, 355 S.E.2d 601 (1987) (*Hudock I*). Bernstein argues that he earned the fee, that Mr. Smith owed him money, and that the fee was reasonable. But as BPR member Joanne Doddy Fort, writing for a unanimous Board, cogently explained in the Board's Report, Bernstein

> had the opportunity to challenge the fee award before the Commission and he could have challenged the Commission's award in the courts of Virginia. He

chose not to pursue the issue any further. Having made that decision, he became bound by the decision of the Commission. The issue before us is not a novel one. The Court has already clearly addressed the issue of what constitutes an "illegal fee" in the context of a Virginia workers compensation case in *Hudock* where the facts are virtually identical to the case before us. Based on the Court's ruling in *Hudock*, we conclude that Bar Counsel has shown by clear and convincing evidence that Respondent violated Rule 1.5(a) when he charged his client a higher fee than the fee approved by the Commission.

Turning to the commingling charges, the Board found, and we agree, that Bernstein violated Rule 1.15(a) by depositing the settlement funds in Smith's case into Bernstein's own operating account. *See, e.g., In re Ross*, 658 A.2d 209 (D.C.1995). The Board also found, and we again agree, that Bernstein violated Rule 1.17(a) by failing to segregate Smith's funds from his own. *See, e.g., id.; In re Hessler*, 549 A.2d 700 (D.C.1988) (construing former DR 9–103(A), the predecessor to Rule 1.17(a)). Bernstein claims that he was primarily a criminal practitioner and that he was unfamiliar with the proscriptions against commingling. This claim, even if factually true, does not constitute a defense to the charges. *See Ross, supra*, 658 A.2d at 210–11; *In re Harrison*, 461 A.2d 1034, 1036 n. 3 (D.C.1983). We therefore agree with the Board that Bar Counsel established these violations by clear and convincing evi-

---

**8.** Bernstein withheld the $480 as a result of a dispute with one of Mr. Smith's medical providers. See note 9, *infra*.

**9.** The Hearing Committee also found that Bernstein had violated Rule 1.15(b) by failing to promptly notify one of his client's health care providers that he (Bernstein) was hold-

ing funds payable to that provider, and by failing to deliver the funds within a reasonable time. Basing its decision, in substantial part, on family problems which Bernstein was facing at the time, the Board concluded that Bar Counsel had failed to prove this violation by clear and convincing evidence.

dence.[10]

Finally, the Board found that Bernstein had engaged in dishonesty, in violation of Rule 8.4(c):

Bar Counsel charged Respondent with a dishonesty violation for not informing his client that he had made a request to increase the Commission's award of a $4,000 legal fee to a fee of $7,500; for not telling his client that the Commission had awarded a $6,000 legal fee for the workers' compensation case and for taking the $9,000 fee after receiving the ruling of the Commission on the amount of legal fees to which he was entitled.

Respondent denies any dishonesty because his fee was, at all times, less than the one-third contingent fee that was reflected in the retainer agreement signed by his client. Moreover, Respondent maintains that he worked diligently for his fee over a year and a half period and obtained a favorable result for his client. Respondent has steadfastly insisted that he was entitled to his full fee and he has challenged the right of the Commission to reduce the fee to $6,000, calling the Commission's action "an unconstitutional State impairment of a private contract" amounting to "an unconstitutional 'taking' without Due Process."

The Hearing Committee concluded that Bar Counsel had demonstrated by clear and convincing evidence that Respondent misled his client, deliberately took funds to which he was not entitled, and never informed his client of the Commission's award of legal fees in violation of Rule 8.4(c). The Committee concludes that Respondent's actions constituted acts of dishonesty under the definitions set out by the Court in *In re Shorter*, 570 A.2d 760 (D.C.1990). In *Shorter*, the Court defined "deceit" as "the suppression of a fact by one who is bound to disclose it," defined "misrepresentation" as a "statement made by a party that a thing is in fact a particular way, when it is not so; untrue representation; false or incorrect statements or accounts"; and defined "dishonesty" as "encompass[ing] fraudulent, deceitful, or misrepresentative behavior ... in addition ... it encompasses conduct evincing a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness."

We agree with the Hearing Committee that Respondent's conduct was dishonest. Because he disagreed with the adjustment that the Commission made to his legal fees, Respondent did not disclose the Commission Order concerning legal fees to his client; withheld from his client settlement funds that the Commission had ordered be paid to his client, and deliberately took and used funds that he was not entitled to take. We conclude that Bar Counsel has demonstrated a Rule 8.4(c) violation by clear and convincing evidence.

---

**10.** In a separate concurring opinion, the non-lawyer member of the Hearing Committee, Mr. Morton Gluck, wrote as follows:

With respect to the violations of Rules 1.15(a) and 1.17(A), I note that Respondent had no previous occasion to maintain an escrow account and in fact disbursed all funds promptly. Respondent received the insurance check of $30,000 on October 5, 1992 and, after the check had cleared, disbursed all but $480 by October 13. The $480 was a third party disputed payment and is subject to a separate issue; $9,000 was Respondent's inappropriate fee, but is not in itself a violation of Rules 1.15 or 1.17. While Respondent's failure to deposit the money in an escrow account was a technical violation of these rules, it did not result in injury to his client or to third parties nor improperly enrich him.

(Citations to record omitted.) We believe that Mr. Gluck has accurately characterized what occurred in relation to these violations.

(Citations to record and some internal citations omitted; alterations in original.)

■ We adopt the foregoing analysis. We also emphasize that "[c]lients must be able to rely unquestioningly on the truthfulness of their counsel." *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc). "Concealment or suppression of a material fact is as fraudulent as a positive direct misrepresentation." *In re Mitchell,* 727 A.2d 308, 315 (D.C.1999) (citations omitted). Bernstein's conduct in concealing from Mr. Smith that the Commission had limited his fee to $6,000 was quintessentially dishonest, and the deception enabled Bernstein to retain $3,000 that should have been disbursed to his client. By these actions, Bernstein treated his client as an adversary to be "conned" rather than as a person to whom Bernstein owed a fiduciary duty of loyalty, full disclosure and trustworthiness.[11]

## III.

### BERNSTEIN'S CONTENTIONS

Before this court, Bernstein's principal contention appears to be that the Board should have applied Virginia's ethical standards, rather than the District's Rules of Professional Conduct. He relies on Rule 8.5(b)(1), which provides:

(b) *Choice of Law.* In any exercise of the disciplinary authority of this jurisdiction, the Rules of Professional Conduct to be applied shall be as follows:

(1) For conduct in connection with a proceeding in a court before which a lawyer has been admitted to practice (either generally or for purposes of that proceeding), the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise.

(Font altered.)

■ Rule 8.5 (b)(1) became effective in November 1996, more than three years after the misconduct in this case. Bar Counsel contends that this Rule is therefore inapplicable to the present case, even though it was in effect by the time the proceedings before the Hearing Committee took place. Further, Bar Counsel claims, and the Hearing Committee and the Board found, that Bernstein never demonstrated that he had been admitted to practice *pro hac vice* before a Virginia court. Bar Counsel also points out that the Industrial Commission of Virginia is not a court. The Hearing Committee and the Board both concluded that the District's Rules on Professional Conduct were applicable.[12]

■ We find it unnecessary to reach the substance of Bernstein's choice-of-law contentions. Even if we were to assume, for the sake of argument, that the Board should have applied Virginia rules, the Board's application of the District's rules does not undermine the proposed sanction, for Bernstein has not shown that he suf-

**11.** We note that although Bernstein retained for his own use money properly belonging to his client, Bar Counsel did not charge Bernstein with misappropriation. We therefore have no occasion to decide whether his conduct constituted misappropriation. The shadow of misappropriation, however, looms over Bernstein's conduct in this case. Judge Steadman would request supplemental briefing on this issue.

**12.** As noted by the Board, "th[is c]ourt has previously ruled that the out of town actions of an active member of this Bar are subject to review ... under the District's Rules on Professional Responsibility." Citing *In re Wade,* 526 A.2d 936, 938–39 (D.C.1987), Bernstein does not contest this proposition, but argues that although his conduct was subject to the District's disciplinary jurisdiction, the Board erred in its application of governing choice-of-law principles.

fered prejudice. In his earlier brush with the disciplinary system, Bernstein presented a contention similar to the one he makes here, but the court rejected it:

> Respondent suggests that it is the West Virginia rules that are applicable to his conduct as a matter of choice of law. This argument is basically moot since respondent does not demonstrate how the result would be different if we applied West Virginia's version of the Rules of Professional Responsibility rather than our own.

*Bernstein I, supra,* 707 A.2d at 375 n. 6.

■■ In this case, Bernstein has not shown, nor can he, that if the Virginia rules had been applied, the result would have been more favorable to him. The Supreme Court of Virginia held in *Hudock I, supra,* 355 S.E.2d at 602–04, that the retention of a fee in excess of that awarded by the Commission constituted collection of an illegal fee. With respect to the commingling violations, Bernstein's conduct would have run afoul of DR 9–102(A) of the Virginia Code of Professional Responsibility.[13] Va. S.Ct. Prof. Resp. Canons DR 9–102(A) (Michie 1992). Finally, Bernstein does not contend, nor could he reasonably do so, that Virginia would tolerate an attorney's deceptive conduct vis-a-vis his client where that conduct was designed to, and did, enable the attorney to retain an unlawful fee by concealing relevant facts from the client. *See* Va. S.Ct. Prof. Resp. Canons DR 1–102(A)(4) (Michie 1992) ("A lawyer shall not ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation which reflects adversely on a lawyer's fitness to practice law."); *Blue v. Seventh Dist. Comm. of Va. State Bar,* 220 Va. 1056, 265 S.E.2d 753, 754 (1980) (identifying same prohibition under the then-applicable disciplinary rules).[14]

---

**13.** At the time of Bernstein's misconduct, the applicable Virginia canon provided:

> *Preserving Identity of Funds and Property of a Client.*—(A) All funds of clients paid a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and *no funds belonging to the lawyer or law firm shall be deposited therein except as follows:*
>
> (1) Funds reasonably sufficient to pay bank charges may be deposited therein.
>
> (2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

Va. S.Ct. Prof. Resp. Canons DR 9–102(A) (Michie 1992) (emphasis added).

**14.** Bernstein claims that the proceedings against him were improperly conducted because, he asserts, two members of the Hearing Committee were biased against him. He also argues that the Hearing Committee's report was invalid because, according to him, the Committee was not unanimous. Bernstein further complains that the Hearing Committee did not issue its report within sixty days, as required by D.C. Bar R. XI, § 9(a). Finally, he asserts, at times in harsh and inappropriate language, that the Assistant Bar Counsel who prosecuted the case was vindictive and retaliatory against him and subjected him to selective prosecution. We agree with the Board's disposition of all of these contentions, and we find plenary discussion of them unnecessary.

We add a few further observations. Bernstein has made no showing that any alleged bias against him on the part of members of the Hearing Committee was judicial in nature. *See In re Stanback,* 681 A.2d 1109, 1117 (D.C.1996). As to Bernstein's allegation that the Hearing Committee was not unanimous, the Committee's decision was signed by all three members; the member who wrote a brief separate concurring opinion, see p. 314 n. 10 *supra,* also joined the opinion of the majority. Moreover, D.C. Bar R. XI, § 5(b) requires a Hearing Committee to "act only

## IV.

## THE SANCTION

Turning to the appropriate sanction, the Board has recommended that

Respondent be suspended for nine-months for violating Rules 1.5(a), 1.15(a), 1.17(a) and 8.4(c). The Board further recommends that three conditions be placed on Respondent's reinstatement pursuant to Rule XI, § 3(b): (1) that he make restitution to John Smith in the amount of $3,000 plus interest at the legal rate of 6% from October 1992; (2) that he take a Continuing Legal Education course on professional responsibility; and (3) that he certify that he has read the Standards of Civility in Professional Conduct.

We adopt the Board's recommendation with respect to Bernstein's suspension, and we agree with the first two proposed conditions of reinstatement. We do not adopt the third condition.

### A. *Suspension.*

In determining the appropriate discipline, the court "will 'adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Dunietz,* 687 A.2d 206, 210 (D.C. 1996) (citing D.C. Bar R. XI, § 9(g)(1)); *accord, In re Boykins,* 748 A.2d 413, 414

(D.C.2000) (per curiam). Here, the Board's recommendation is neither inconsistent with our prior cases nor unwarranted by the facts. If anything, the proposed discipline is on the lenient side, but Bar Counsel has not challenged it.[15]

In making its recommendation, the Board noted that Bernstein had previously been disciplined, see *supra* note 7,[16] that his misconduct in this case involved four separate rule violations, that Bernstein's client had been prejudiced, that Bernstein had failed to acknowledge his wrongful conduct, that he had shown no remorse, and that he had failed to make restitution to his client. Bernstein asserts that "[t]here should be no sanction because [he] was charged and tried under rules ... which do not apply." In the alternative, he contends that, if a sanction is to be imposed, "it should be the same reprimand issued to attorney Hudo[ck], and an admonition to never again venture *pro hac vice* into a foreign jurisdiction without the active assistance of knowledgeable foreign counsel."

■ We agree with the Board that Bernstein's multiple violations, including in particular his dishonesty and betrayal of his client, warrant, at least, suspension for a significant period of time. Indeed, as we have indicated, see note 11, *supra,* there are aspects of this case that suggest activity very similar to misappropriation, for

with the concurrence of a majority of its members," so that unanimity is not required. Finally, although we regard as unfortunate the lengthy delay—well over a year—between the conclusion of the hearing and the issuance of the Hearing Committee's report, the 60–day requirement is directory, rather than mandatory; we cannot allow the principal purpose of the disciplinary rules, namely, the protection of the public, to be thwarted solely because the Hearing Committee failed to issue its decision in timely fashion. *See, e.g., In re Morrell,* 684 A.2d 361, 370 (D.C.1996); *In*

*re Williams,* 513 A.2d 793, 796–97 (D.C.1986) (per curiam).

**15.** Before the Hearing Committee and the Board, Bar Counsel proposed a three-year suspension.

**16.** In *Bernstein I, supra* note 7, 707 A.2d at 377, we suspended Bernstein for thirty days for his neglect of his clients' matter, for his failure to communicate with his clients, and for his failure to return his clients' papers after termination of the relationship.

which disbarment is the presumptive remedy. *See In re Addams,* 579 A.2d 190, 192–99 (D.C.1990) (en banc). Taken as a whole, and considering Bernstein's prior record of discipline, as well as his lack of remorse and his pronounced lack of respect for authority, this case calls for a suspension at least as severe as, *e.g.,* in *In re Vogel,* 382 A.2d 275, 276–82 (D.C.1978) (per curiam) (nine-month suspension for conduct involving dishonesty and misrepresentation in withdrawing a fee from an escrow account contrary to the terms of its deposit), and *In re Chisholm,* 679 A.2d 495, 502–06 (D.C.1996) (six-month suspension for inadequate representation and intentional prejudice to client, and for fraud, with reinstatement conditioned on proof of fitness and restitution).[17] The Board's recommendation that Bernstein be suspended for nine months is entirely reasonable, and not at all unduly harsh.

### B. *Restitution.*

Rule XI, § 3(b) provides that the court "may require an attorney to make restitution ... to persons financially injured by [his] conduct." D.C. Bar R. XI, § 3(b). The Board has recommended that Bernstein be required, as a condition of reinstatement, to pay Mr. Smith restitution in the amount of $3,000, together with interest from October 1992. Arguing against the Board's recommendation, Bernstein responds that he "do[es] not owe Mr. Smith any money." In an earlier submission, Bernstein characterized the Hearing Committee's restitution recommendation as an "attempt to extort money from me for the benefit of [the] Smith[s]." Notwithstanding this intemperate rhetorical flourish, the record amply supports the Board's recommendation that full restitu-

tion, including interest, be made a condition of Bernstein's reinstatement.

### C. *Completion of a course on professional responsibility.*

The Board's recommendation that, as a further condition of reinstatement, Bernstein be required to complete a course on professional responsibility is well-grounded in the record. In his brief in this court, Bernstein, who was admitted to practice in 1975, claimed that in October 1992, he "was wholly unaware of the D.C. escrow rule which ... didn't even come into effect until June, 1992, *after* the financial settlement in [the Smith] case was reached," and that he "didn't know anything about the new escrow rule and therefore could not have knowingly violated it." (Emphasis in original.)

Bernstein has also "question[ed] the propriety of applying the same rules to a single practitioner who almost never holds any client funds ... as are applied to large law firms who do trust, tax, estate or other work which causes them to hold client funds for long periods." According to Bernstein, "[t]his is like applying the same rules to General Motors as applies [sic] to a 'ma and pop' corner store." This unorthodox contention cannot be reconciled with the Preface to the Rules of Professional Conduct, effective January 1, 1991, which includes the following passage:

> Over the course of the next year, the District of Columbia Bar will sponsor a series of educational workshops on the new rules. All members of the Bar are encouraged to attend, for the rules are complex and comprehensive. *All members of the Bar, of course, will be subject*

---

17. In the present case, Bar Counsel has not proposed that Bernstein be required to demonstrate fitness to practice as a condition of reinstatement.

*to the Rules whether or not they attend a workshop.*

(Emphasis added.)

In his post-hearing brief, filed in December 1997, Bernstein complained that the Bar "expect[s][him] to be omnicient [*sic*] regarding changes and provisions [of the] complex 'professional responsibility' rules." His continuing argument that he did not engage in commingling in 1992 following the receipt of his client's settlement funds is altogether lacking in merit and demonstrates his unwillingness to recognize and adhere to a fundamental ethical rule. We agree with Bar Counsel that Bernstein's "behavior and lack of appreciation of the Rules will continue to make [him] a risk to violate ethical rules in the future." Although compelling Bernstein to take a professional responsibility course against his will may not correct his attitude and conduct, we conclude that, on the record before us, this condition of reinstatement is warranted.

### D. *Voluntary Standards of Civility.*

■ The Board's third proposed condition of reinstatement—namely, that Bernstein be required to certify that he has read the District of Columbia Bar's "Voluntary Standards of Civility in Professional Conduct"—was obviously based on Bernstein's resort to intemperate and inflammatory rhetoric throughout the history of this case. In a post-hearing submission to the Hearing Committee, Bernstein contended that "[i]n a sane world, ... a prosecution [of me] for allegedly failing to maintain records of those payments for five years would not occur. It is occurring because you people will invent whatever garbage it takes to put me out of business." In another unorthodox passage, Bernstein wrote that the Assistant Bar Counsel who had prosecuted the case "should rot in Hell, and he will." Bern-

stein concluded his final submission to the BPR as follows:

I protest, take exception to your upcoming Report for appellate purposes, and refuse to participate further in these unlawful proceedings until they proceed to the Court of Appeals. *For what has gone on so far is to justice what the Gestapo is to lawful police.*

(Emphasis in original.)

In his brief in this court, Bernstein has denounced "Bar Counsel vultures," as well as the "Hearing Committee, Bar Counsel and Board oppressors." The brief contains repeated references to representatives of the Office of Bar Counsel as "persecutors" rather than "prosecutors." Bernstein claims to have been persecuted or wronged not only by the various participants in the disciplinary process, but also by his ex-wife, by his former client, by a "bureaucrat" at the Industrial Commission of Virginia, and by a physician whom he accuses of charging an excessive fee.

■ Nevertheless, we decline to impose the "civility" condition proposed by the Board. The Voluntary Standards of Civility constitute a constructive and helpful attempt to improve the quality and atmospherics of legal practice in the nation's capital, but they are voluntary and aspirational in nature. They are not binding on attorneys in this jurisdiction. As stated in their preamble, they "are not intended by the D.C. Bar Board of Governors to be used as a basis for litigation or sanctions." We are therefore reluctant to insert into the disciplinary process any mandatory enforcement of these Standards.

We also question whether the proposed condition would be effective in this particular case. The persistent tenor of Bernstein's submissions persuades us that his incivility has been deliberate, that it has

not been the result of any lack of familiarity with the norms of professional behavior, and that compelling Bernstein, against his will, to read the Standards of Civility would not be likely to bring about a change of heart or an improvement in conduct.

In *In re Shearin*, 764 A.2d 774 (D.C. 2000), we suspended an attorney from practice, and we required, as a condition of her reinstatement, that she demonstrate her fitness to practice law. We noted, in accordance with a recommendation by the Board, that

> in the event that Ms. Shearin should seek reinstatement, the Board may consider, *inter alia*, whether she has familiarized herself with the Standards of Civility in Professional Conduct issued by the District of Columbia Bar.

*Id.* at 778 n. 3. But authorizing the Board to consider, as one of several factors relevant to reinstatement, whether an attorney has familiarized herself with the Voluntary Standards of Civility is not the same as ordering an attorney to read the Standards and effectively telling him that, if he fails to do so, he will forfeit any hope of readmission to the profession. We conclude that the invocation of the Standards of Civility in the *Shearin* footnote goes as far as we should ever go in tying voluntary and aspirational standards to the right to practice law. Accordingly, we decline to adopt the third condition of reinstatement proposed by the Board.[18]

## V.

### CONCLUSION

For the foregoing reasons, Kenneth R. Bernstein is suspended from practice for a period of nine months. The following conditions are placed on Bernstein's reinstatement:

1. he must make full restitution to John D. Smith in the amount of $3,000, together with interest at the legal rate of 6% from October 1992; and

2. he must demonstrate that he has completed a Continuing Legal Education course on professional responsibility.

*So ordered.*[19]

---

**18.** Because we have adopted most of the Board's recommended sanction, we do not believe that our decision not to include what we regard as the relatively minor Standards of Civility condition is contrary to D.C. Bar R. XI, § 9(g)(1).

**19.** Bernstein's attention is again directed to the requirements of D.C. Bar R. XI, §§ 14 and 16, which addresses the duties of suspended attorneys and the procedures for reinstatement. *See Bernstein I, supra,* 707 A.2d at 377.