## In re Claude W. ROXBOROUGH, Respondent.

### A Member of the Bar of the District of Columbia Court of Appeals.

### No. 01–BG–298.

District of Columbia Court of Appeals.

Submitted May 24, 2001.
Decided June 7, 2001.

Before SCHWELB and REID, Associate Judges, and KERN, Senior Judge.

PER CURIAM:

Claude W. Roxborough was admitted to the District of Columbia Bar on January 26, 1973. Since that time, he has been the subject of several disciplinary proceedings which are described in detail in the comprehensive and balanced Report and Recommendation of the Board on Professional Responsibility dated March 12, 2001, a copy of which is attached hereto and made a part hereof. *See generally In re Roxborough,* 675 A.2d 950 (D.C.1996) (per curiam) (*Roxborough I*); *In re Roxborough,* 692 A.2d 1379 (D.C.1997) (per curiam) (*Roxborough II*); *In re Roxborough,* 707 A.2d 57 (D.C.1998) (*Roxborough III*). As reflected in the Board's Report, this court has suspended Roxborough from practice and has conditioned his reinstatement on proof of fitness to practice law.

Roxborough petitioned the court for reinstatement, and his petition was initially considered by Hearing Committee No. One. Before the Committee, Bar Counsel filed proposed Findings of Fact and Conclusions of Law suggesting that Roxborough be reinstated with conditions, substantially as noted below. The Hearing Committee likewise recommended reinstatement with conditions. The Board, after carefully applying the five "Roundtree factors,"[1] concluded that "this is a close case for reinstatement because of the seriousness of the original misconduct, all of which was related to Petitioner's practice, and the fact that restitution is incomplete." Nevertheless, the Board recommended reinstatement with the following conditions:

1) That Petitioner implement the restitution plan attached to this Report and Recommendation, and report his progress to Bar Counsel every six months;

2) That Petitioner continue his consultation with the Lawyers' Counseling Committee and Lawyers' Practice Assistance Committee for at least three years after reinstatement, and report to Bar Counsel concerning those consultations every six months; and

3) That Petitioner be under the supervision of a practice monitor to be appointed by the Board for one year following Petitioner's entry of private practice. Petitioner shall inform the Board's Executive Attorney 60 days before under-

1. *In re Roundtree,* 503 A.2d 1215, 1217 (D.C. 1985).

taking private practice so that a practice monitor can be appointed. The practice monitor shall report to the Executive Attorney for the Board every three months.

We agree with the Board's view that Roxborough's misconduct was serious. We are also of the opinion that caution should be exercised in ordering reinstatement where, as in this case, substantial amounts in restitution remain to be paid. Nevertheless, the deference that we accord to the Board's recommendation, D.C. Bar R. XI, §§ 9(g) & 16(e), is even greater where, as here, the petitioner's position has the active support of the Office of Bar Counsel. *See, e.g., In re Goldsborough,* 654 A.2d 1285, 1288 (D.C.1995). Accordingly, Roxborough is hereby reinstated to the practice of law, subject to the conditions described in the Board's report and quoted above.

*So ordered.*

**ATTACHMENT I**

**DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY**

In the Matter of:

CLAUDE ROXBOROUGH,

Petitioner.

Bar Docket No. 139–98

(Original Disciplinary Proceedings:

No. 96–BG–1491

Judges Steadman, Ruiz, and Reid

No. 95–BG–1710

Judges Terry, Steadman and Schwelb

No. 96–BG–1003

Judges Ferren, Terry, and Senior Judge Gallagher)

***REPORT AND RECOMMENDATION***

This matter arises from the petition by Claude Roxborough to be reinstated to the Bar. Bar Counsel does not object to his reinstatement provided certain conditions are met. Hearing Committee Number One recommends reinstatement with the recommended conditions. The Board adopts the Hearing Committee's findings of fact, with minor additions to describe the underlying disciplinary cases in greater detail. The Board concludes that, deferring as it should to the Hearing Committee's fact findings, Petitioner has established clear and convincing evidence to satisfy the requirements for reinstatement and recommends reinstatement with conditions.

***FINDINGS OF FACT***

A. ***Biographical Facts***

1. Born on August 12, 1947, Petitioner now is 53 years old. He was admitted to the Bar on January 26, 1973, after he graduated from Howard University School of Law in 1972. After he finished law school, he clerked for The Hon. Joseph Waddy of the United States District Court for the District of Columbia.

**B. *Prior Misconduct***

***Roxborough I*** **(Bar Docket No. 140–93)**

2. In April 1991, Dewey Madison retained Petitioner to file a complaint in the Circuit Court for Prince George's County (the "Maryland Court") for review of a custody and child-support order. BX 6 at 2.[1] In light of his ex-wife's decision to relinquish custody of their son, Mr. Madison sought relief from the obligation to

1. "BX" refers to exhibits submitted by Bar Counsel; "PX" refers to exhibits submitted by Mr. Roxborough. "Tr. I" refers to the first day of hearings on December 15, 1998; "Tr. II" refers to the second day of hearings on January 8, 1999; and "Tr. III" refers to the third day of hearings on September 14, 1999.

pay child support. *Id.* Mr. Madison paid Petitioner a $500 retainer fee. *Id.*

3. A complaint was prepared. After Mr. Madison executed it, Petitioner signed and filed it in May 1991. *Id.* When the Maryland Court referred the matter to mandatory mediation, Petitioner's law firm billed Mr. Madison for an additional $215, which he promptly paid. *Id.*

4. Petitioner was the only member of his law firm who was licensed to practice in Maryland. *Id.* In light of his diminishing eyesight and emotional difficulties, discussed in greater detail at pages 12–14, below, he delegated the work on the Madison matter to his associates. The members of Petitioner's staff who worked on Mr. Madison's matter did so under his supervision. *Id.*

5. Petitioner's law firm wrote to Mr. Madison in September 1991 to inform him that the complaint had been filed but that his ex-wife had not responded. *Id.* Mr. Madison telephoned an associate at Petitioner's law firm to report his ex-wife's location. *Id.* at 2–3. Despite Mr. Madison's efforts, Petitioner failed to effect service of the complaint or to file any documents with the Maryland Court explaining his failure to effect service. *Id.* at 3.

6. In January 1993, the Clerk of the Maryland Court notified Petitioner that the Madison complaint would be dismissed for lack of prosecution, unless there was a response by February 8, 1993. *Id.* Someone from Petitioner's law firm wrote to Mr. Madison to inform him that because he had failed to respond to the letter sent by the law firm in September 1991, and because the Maryland Court was about to dismiss his complaint, the case would be put in inactive status. *Id.* Mr. Madison immediately contacted the author of the letter and made it clear that he in fact had responded to the letter sent in September 1991. *Id.;* Tr. I 76. He also wanted to know what had happened to his case, but no explanation ever was provided him. BX 6 at 3.

7. In February 1993, the Maryland Court dismissed Mr. Madison's civil complaint. *Id.* at 4. Petitioner was found to have failed: to act with reasonable promptness (Rule 1.3), to communicate with his client (Rule 1.4(a)), to supervise an associate (Rule 5.1(b)), and to act competently (Rule 1.1(a)). BX 1. The Court suspended Petitioner with a requirement that he demonstrate fitness before reinstatement. *In re Roxborough,* 675 A.2d 950 (D.C.1996)(per curiam)("*Roxborough I*"). Petitioner did not make the showing of disability in mitigation of sanction permitted by *In re Kersey,* 520 A.2d 321 (D.C.1987), but, before the Court, did "acknowledge[ ] that he 'recognizes that he cannot handle his obligation to continue to practice.'" 675 A.2d at 951. The Court ordered that Petitioner show fitness before reinstatement in accordance with D.C. Bar R. XI, § 16(d). *Id.* at 952. No restitution to the client involved was required, although the Board had recommended that restitution be included as part of the sanction.

***Roxborough II***

**a. *Bar Docket No. 43–93***

8. In November 1991, while in pursuit of another automobile, a District of Columbia police car collided with a third automobile, killing the driver, Tanya Rich, her daughter and her unborn son. BX 9 at 2–3. The driver's mother and sister, Alberta Rich and Melody Rich respectively, were named co-personal representatives of her estate. *Id.* A third person, William Woodard, who claimed paternity of the driver's two deceased children, was appointed personal representative of the children's estates. *Id.* at 3.

9. Shortly before the statute of limitations for filing a wrongful-death suit against the District of Columbia was about to expire, Alberta Rich hired Petitioner to represent her. *Id.* Another lawyer, Patrick Regan, Esquire, was hired to represent Mr. Woodard and Melody Rich. *Id.*

10. In September 1992, Petitioner filed a wrongful-death action on behalf of Alberta Rich, and Mr. Regan filed similar suits on behalf of Mr. Woodard and Melody Rich. *Id.* From October 10, 1992 onward, Petitioner knew that Mr. Regan was representing Mr. Woodard. *Id.*

11. In November 1992, Petitioner sought to remove Mr. Woodard as personal representative of the children's estates and to appoint Alberta Rich in his place. *Id.* As a basis of removal, Petitioner alleged that Mr. Woodard had abused Tanya Rich and was not the father of the two deceased children. *Id.*

12. Mr. Regan responded by filing a petition to establish Mr. Woodard's paternity of the children, to declare him Tanya Rich's common-law husband, to remove Petitioner's client as co-personal representative of Tanya Rich's estate, and to appoint Mr. Woodard as the sole personal representative of Tanya Rich's estate. *Id.*

13. In November 1992, Petitioner hired a private investigator, Richard Ford, to look into the circumstances surrounding the accident. *Id.* Petitioner failed to warn Mr. Ford of the obligation to avoid contact with other litigants who were represented by counsel. BX 9 at 3–4.

14. Without Petitioner's knowledge or consent, Mr. Ford contacted Mr. Woodard on several occasions. *Id.* at 4. On January 8, 1993, Mr. Ford informed Petitioner that Mr. Woodard wanted to meet with him, and Petitioner told Mr. Ford to cease his contact with Mr. Woodard. *Id.*

15. On the same day, Petitioner met Mr. Woodard in Petitioner's office. *Id.* Petitioner testified that Mr. Woodard informed him that he had fired Mr. Regan. Tr. II 60. Petitioner told Mr. Woodard that he needed something in writing, and he prepared a letter dismissing Mr. Regan, backdated to January 7, 1993, for Mr. Woodard's signature. BX 9 at 4. Although Alberta Rich agreed to Petitioner's dual representation of Mr. Woodard with her, Petitioner failed to discuss with either Alberta Rich or Mr. Woodard the conflict of interest between them. *Id.* Mr. Woodard signed an agreement retaining Petitioner to represent him in his wrongful-death action. *Id.*

16. After Mr. Regan learned what had happened, he met with Mr. Woodard and was re-hired as Mr. Woodard's attorney. *Id.* Mr. Regan then contacted Petitioner, demanding that Petitioner and Mr. Ford cease contacts with Mr. Woodard. *Id.* Mr. Ford continued to attempt to contact Mr. Woodard. *Id.* Petitioner testified that Mr. Ford did so without his authority. Tr. II 61–62.

17. Petitioner sent letters to Mr. Regan, contending that he still represented Mr. Woodard. BX 9 at 5. Mr. Regan responded by filing an ethical complaint with Bar Counsel and informing Petitioner that Mr. Woodard wanted to be represented by him. *Id.*

18. In the spring of 1993, Petitioner filed a complaint on behalf of Alberta Rich against Mr. Woodard, alleging his liability for the deaths of Tanya Rich and her children. *Id.* Petitioner also filed a motion stating that Mr. Ford's investigation had led to the discovery of Mr. Woodard's responsibility. *Id.* In October 1993, Petitioner withdrew as counsel for Alberta Rich. *Id.* The wrongful-death matters later were settled. *Id.*

19. The Court concluded that Petitioner engaged in the unauthorized communication with an adverse party represented by counsel (Rule 4.2(a)), represented a client with an adverse position, creating an actual conflict of interest (Rule 1.7(a)), misused client confidences (Rule 1.6(a)(2)), and failed to supervise an associate (Rule 5.3(a)), and to mitigate the consequences of the unethical conduct of a nonlegal subordinate subject to his supervision (Rule 5.3(c)). *In re Roxborough*, 692 A.2d 1379 (D.C.1997)(per curiam)("*Roxborough II*").

**b. *Bar Docket No. 377–93***

20. In 1992, Arthur Takeall filed a copyright-infringement claim against PepsiCo in the United States District Court for the District of Maryland. BX 9 at 8. After he lost a motion for summary judgment, he discharged his lawyer and retained Petitioner to handle his appeal before the United States Court of Appeals for the Fourth Circuit. *Id.*

21. After Petitioner was retained, he persuaded Mr. Takeall to rehire his earlier lawyer. *Id.* While Petitioner was to be lead counsel on the appeal, it was unclear which lawyer had principal responsibility for Mr. Takeall's other matters, including proceedings in the District Court concerning the infringement action. *Id.*

22. Mr. Takeall believed that Petitioner was solely responsible for all aspects of the infringement action. Petitioner did not share that understanding. *Id.*

23. Mr. Takeall understood that Petitioner would seek to stay the judgment in the District Court. *Id.* Petitioner failed to do so or to enter his appearance. The District Court issued a writ of attachment garnishing Mr. Takeall's bank account, which contained his veteran's disability benefits. *Id.* Mr. Takeall expected Petitioner to seek the release of the benefits, but Petitioner failed to do so. *Id.*

24. In June 1993, Mr. Takeall fired Petitioner and refused to reconsider his decision. *Id.* A few days after his termination, Petitioner sent a letter to PepsiCo's attorney, without Mr. Takeall's permission, along with a proposed consent agreement releasing the garnished funds. *Id.* Mr. Takeall demanded that Petitioner cease to represent him. *Id.* Petitioner testified that he did not take Mr. Takeall's firing of him seriously because Mr. Takeall had fired him before. Tr. II 64. Petitioner billed Mr. Takeall for expenses, including long-distance telephone calls made after he had been fired. BX 9 at 9.

25. The Court found that Petitioner failed to withdraw after discharge (Rule 1.16(a)(3)). *Roxborough II*, 692 A.2d 1379.

26. For all of the misconduct found in *Roxborough II*, the Court imposed a 60 day suspension, *nunc pro tunc* to the date of the completion of the suspension in *Roxborough I*, to run consecutively to that 30–day suspension, with a requirement that Petitioner show fitness for reinstatement, citing D.C. Bar R. XI, § 16, and complete a course on the Rules of Professional Conduct. 692 A.2d 1379. Petitioner did not raise *Kersey* mitigation issues. The Court did not order restitution to any of the clients involved.

***Roxborough III* (Bar Docket No. 383–96)**

27. On September 11, 1996, the Court of Appeals of Maryland suspended Petitioner for 60 days. BX 11. That Court acted on a joint petition filed by the Maryland Attorney Grievance Commission and Petitioner. BX 11, 13, 14 at 1. The petition, in turn, was based on the District of Columbia Court of Appeals' decision in *Roxborough I* to suspend Petitioner for 30 days with fitness, and on two other complaints pending before the Attorney Grievance Commission. BX 13, 14 at 1.

28. On November 12, 1996, the Court of Appeals of Maryland approved a joint consent that Petitioner be placed on inactive status. BX 12. The Court of Appeals of Maryland ordered Petitioner to remain inactive until he could show by proper evidence that his health had been restored, and that he was capable of engaging in the competent practice of law. *Id.*

29. The District of Columbia Court of Appeals concluded that the action of the Court of Appeals of Maryland was not based on the District of Columbia discipline alone, but was based in part on independent violations in Maryland. The Court ordered a reciprocal suspension, *nunc pro tunc* to November 4, 1997, the date of Petitioner's filing of his § 14(g) affidavit in *Roxborough II,* with reinstatement to be governed by "the terms of D.C. Bar R. §§ 13(g) and 16(d) and the prior suspension orders" of the Court, with eligibility for reinstatement at the end of the terms of suspension Petitioner already was serving. *In re Roxborough,* 707 A.2d 57, 59 (D.C.1998)("*Roxborough III*"). Issues of disability thus were introduced for the first time as an important consideration for Petitioner's reinstatement. The Court did not order restitution in *Roxborough III.*

***Unadjudicated Acts of Misconduct Occurring Prior To The Court's Order of Suspension in Roxborough I*** [2]

a. ***Roxborough/Bar Counsel, Bar Docket No. 421–94***

30. On May 27, 1993, Petitioner's partner was retained to represent a client in a probate matter. BX 17 at 1, 18 at 1. The partner was not licensed to practice law in the District of Columbia at the time. *Id.* Although Petitioner's name was carried on the matter, Petitioner testified that he never met the client. Tr. II 83. Neither Petitioner nor his partner informed the client that the partner was not licensed to practice in the District of Columbia. BX 17 at 1, 18 at 2.

31. In August 1993, Petitioner's partner assigned the client's matter to a paralegal employed by Petitioner's law firm. *Id.*

32. In September 1993, the paralegal informed the client that she had prepared documents for filing in the Probate Division of the District of Columbia Superior Court that required the client's signature, but she failed to inform the client that the law firm expected the client to obtain signatures from certain relatives. *Id.* When the client contacted the law firm a few weeks later in order to inquire about the status of the case, the paralegal informed her that the law firm was waiting for her to secure the signatures from her relatives. *Id.* The client declined to obtain the signatures on the ground that it was the law firm's responsibility to do so. BX 17 at 1–2, 18 at 2. The signatures were needed in order to file the probate petition, but neither the client nor any of the law firm's attorneys secured the required signatures. BX 17 at 2, 18 at 3. On November 24, 1993, the client terminated the law firm's services. *Id.*

33. Bar Counsel had prepared a petition in this matter that was before a Hear-

2. Bar Counsel and Petitioner stipulated to the facts concerning unadjudicated acts of misconduct occurring prior to the Court's order of suspension in *Roxborough I.* BX 17. Some of the misconduct in these bar docket numbers was petitioned; other complaints did not reach the petition stage. Under current Board practice, petitioned matters are dismissed without prejudice once the Board recommends disbarment or a suspension with a showing of fitness required for reinstatement. The unadjudicated misconduct then is available for whatever consideration may be warranted upon a petition for reinstatement. *See* Board Rule 9.8.

ing Committee when the Court ordered in *Roxborough I* that Respondent be suspended with a requirement to show fitness before reinstatement. BX 18.

**b. *Roxborough/Bar Counsel, Bar Docket No. 453–94***

34. In March 1991, Petitioner was retained for $2,500 to represent Mr. LeRoy Allen in an employment matter in the United States Court of Appeals for the Federal Circuit. BX 17 at 2, 19 at 1. At the time that Petitioner noted his client's appeal, he was not a member of the bar of the Federal Circuit. *Id.*

35. On April 17, 1991 and again on July 31, 1991, the court dismissed the client's petition for failure to prosecute, based upon Petitioner's failure to file appropriate pleadings. BX 17 at 2, 19 at 2.

36. On September 24, 1991, Petitioner's partner forwarded a copy of a brief to the client for review and comment, without informing the client that the case had been dismissed several months earlier. BX 17 at 2, 19 at 3. The client contacted Petitioner on several occasions to inquire about the status of his case, but neither Petitioner nor his partner advised the client that the case had been dismissed. *Id.* On August 22, 1991, the court dismissed Petitioner's motion to reinstate the case. BX 17 at 2.

37. The matter was petitioned by Bar Counsel. BX 19.

38. Petitioner testified that he would agree to restitution in the amount of $2,500 to this client. Tr. III 8.

**c. *Roxborough/Humbles, Bar Docket No. 64–95***

39. On August 5, 1993, Petitioner was retained to handle a matter involving a proposed sale of property jointly owned by his client and the client's brother. BX 17 at 2, 20 at 1–2. Petitioner failed to appear at a hearing on behalf of his client. BX 17 at 2, 20 at 3. Thereafter, Petitioner failed to respond to a motion for attorney's fees filed by opposing counsel or to oppose a motion to compel settlement. *Id.*

40. A court order dated January 20, 1995 noted that settlement of the client's matter was unopposed, but in fact Petitioner's client had not consented to the settlement. BX 17 at 2, 20 at 3. Petitioner also failed to file a response to opposing counsel's amended motion for attorney's fees. BX 17 at 2, 20 at 4. As a result, the client was ordered to pay opposing counsel's attorney's fees. BX 17 at 2–3, 20 at 4.

41. Bar Counsel petitioned this matter. BX 20.

**d. *Roxborough/Hughes, Bar Docket No. 136–96***

42. On January 3, 1996, Petitioner was retained to handle a wrongful-termination matter. He failed to provide his client a written retainer agreement. BX 17 at 3, 21. After Petitioner accepted a retainer fee of $250, he failed to file his client's complaint or to communicate with his client. *Id.*

43. This matter had not been petitioned by Bar Counsel.

***Unadjudicated Acts of Misconduct Occurring Subsequent to Entry of the Court's Order of Suspension in Roxborough I*** [3]

3. Bar Counsel also introduced evidence of unadjudicated acts of misconduct occurring after the Court's order of suspension in *Roxborough I.* These acts, which are not contested by Petitioner, are not subject to the admissibility requirements of Board Rule 9.8, but can be considered by the Board pursuant to *In re Roundtree,* 503 A.2d 1215 (D.C.1985) as conduct since discipline was imposed.

e. *Roxborough/Bar Counsel, Bar Docket No. 342–97*

44. Henry J. Brothers, Esquire, was retained to represent Industrial Bank of Washington ("IBW") in connection with a construction loan to Rufus Stancil, Delores Stancil and Hasselrig Construction Company. Burrell Hasselrig was the company's representative. BX 28, 30. Petitioner was identified as legal counsel for the Stancils and Mr. Hasselrig. *Id.*

45. On July 18, 1997, Mr. Brothers received a fax from Willie Faye Hearring Garrett, Esquire, in which Ms. Garrett explained that Petitioner was on inactive status from the Maryland Bar. BX 28 at 2–3. Ms. Garrett also asked that Mr. Brothers deal with Petitioner as her paralegal, with her full confidence and authority. *Id.* at 3.

46. During a conference call on July 18, 1997, Mr. Stancil stated that he had not known until that day that Petitioner was not a licensed attorney. BX 28 at 2. During his reinstatement hearing, Petitioner testified that he had advised Mr. Stancil and Mr. Hasselrig that he no longer was practicing law and could act only as a consultant. Tr. I 146. He confirmed that he had started the matter as counsel. *Id.* Petitioner acknowledged that Mr. Brothers had thought Petitioner was acting as an attorney and that Petitioner does not believe that Mr. Brothers filed the ethical complaint to secure leverage in the commercial transaction. *Id.* 156–57. Petitioner further testified that everyone at IBW knew he was suspended from the practice of law. *Id.* 148–49.

47. Bar Counsel had not petitioned this matter.

f. *Roxborough/Johnson, Bar Docket No. 386–98*

48. Bobby B. Stafford, Esquire, filed a complaint with Bar Counsel on behalf of his client, Joyce Johnson, stating that his client was the personal representative of the Estate of Viola Morris Gunthrop in the Probate Division of the Superior Court of the District of Columbia, No. 1388–84 (the "Gunthrop Estate"). BX 36 at 1.

49. Ms. Johnson settled a real-estate matter with Petitioner's former law firm, Roxborough & Tillerson, which was required to hold $5,500 in escrow. *Id.* Although a portion of the funds was returned through a garnishment, at the time of the hearing approximately $4,500 remained outstanding. *Id.*

50. Petitioner is unsure whether his former law firm owes the Gunthrop Estate any further funds. BX 37. He promised to make the Gunthrop Estate whole upon a showing that additional amounts are owed. *Id.*

51. Petitioner testified that the file has been removed from his old office, and that he has been unsuccessful in his attempts to locate it. Tr. II 112.

***Petitioner's Other Acts of Adjudicated Misconduct***

52. Petitioner was informally admonished, on October 21, 1977, for conduct that occurred in 1976, while he represented a defendant in a widely publicized murder trial. BX 2; Tr. II 3–6. During the trial, his first criminal case, he induced the client to execute an assignment of insurance proceeds from her husband, the deceased, thereby turning his legal fee into a forbidden contingency in a criminal case. Tr. II 4–6. Petitioner was found to have violated DR 2–106(C). BX 2.

53. Petitioner was informally admonished in 1981 for conduct that occurred in 1980, when he represented a client in a Social Security matter. BX 3; Tr. II 8–11. He was found to have violated DR 2–106, in that he had charged an excessive fee, and DR 1–102(A)(5), in that he had failed

to cooperate with Bar Counsel. BX 3; Tr. II 11. He refunded $150 to his client. BX 3.

54. The Board on Professional Responsibility informally admonished Petitioner, on March 3, 1989, for neglect of a legal matter entrusted to him, in violation of DR 6–101(A)(3). BX 4; Tr. II 20. Discipline was based upon his failure to form a subchapter S corporation. BX 4; Tr. II 23. His malpractice carrier settled the civil matter for $90,000. Tr. II 25.

### C. *Petitioner's Physical Health*

55. In 1990, Petitioner was diagnosed with a tumor of the parotid gland. BX 32 at 2. Petitioner waited until 1992 to undergo surgery for the tumor. BX B at attachment 4, 32 at 2–3; Tr. I 192–94, Tr. II 37. At the time, he feared that the tumor was cancerous, but it proved not to be so. During this time period, he went to work, shut the door, took the telephone off the hook, and slept. Tr. I 193, Tr. II 37.

56. Petitioner was diagnosed with glaucoma in 1992. BX 34 at 1. Prior to the diagnosis, he was terrified to sleep at night, for fear that his vision would worsen. Tr. II 38. In 1995, he underwent laser surgery, but he has suffered a permanent loss of most of the vision in his left eye. BX 34 at 1. He has moderate myopia in his right eye, which is corrected with glasses. BX 34 at 3. He uses a magnifier, special glasses, and glare-reducing filters to enhance his vision. BX B at attachment 2. He manages his glaucoma with medication. BX 34 at 3.

57. Petitioner has used the rehabilitation services of Columbia Lighthouse for the Blind. BX B at Attachment 2; Tr. I at 188–90. Petitioner has learned how to conduct on-line research and to use the Internet through a special program with Howard University School of Law. Tr. II at 122. He attends the National Capital Citizens with Low Vision support group. BX B at attachment 2. He also has attended a program sponsored by the Maryland Department of Education for low-vision or sight-impaired attorneys. Tr. I 40.

58. Petitioner currently is under treatment for high blood pressure, with medication. *Id.* 195.

### D. *Petitioner's Mental Health*

59. In 1985, Petitioner met with Dr. Kenneth Smothers, a psychiatrist, for treatment for depression and to discuss concerns about Petitioner's difficulties in health and mood. *Id.* 101. Petitioner did not comply with the treatment recommended by Dr. Smothers. *Id.* 101–02.

60. On January 30 and February 17, 1995, at Bar Counsel's request, Petitioner met with Dr. Richard A. Ratner. BX 32 at 1. Dr. Ratner's psychological testing revealed that Petitioner had a moderately severe mental disorder. *Id.* at 5. Dr. Ratner's tests portrayed Petitioner as a narcissistic individual with an inflated sense of self-worth. *Id.* Petitioner used denial when faced with unpleasant circumstances and blamed others for his failures. *Id.* at 6. He fired three secretaries during the period and on one occasion yelled at a judge. Tr. I 43. At one point, he telephoned an opponent's secretary and yelled at her, calling her employer names. *Id.* 43–44.

61. In 1995, Petitioner experienced a depressive disorder resulting in a loss of self-confidence, dejection, and low self-esteem. BX 32 at 6; Tr. II 173. He also experienced anxiety symptoms, which manifested themselves physically as a rapid heart beat, sweating, muscular pains, and a feeling "of being on edge." BX 32 at 6.

62. Petitioner exhibited signs of manic mood swings through his decreased need

for sleep, restlessness, pressured speech and hyper-distractibility. BX 32 at 6; Tr. II 175. Dr. Ratner believed that whether Petitioner would accept treatment was a "real toss-up based on ... a narcissistic-injury." Tr. II 186.

63. Rev. Richard Simon testified that Petitioner was a "wreck" and went off in "rages." Tr. I 52.

64. On February 7, 1996, Petitioner entered psychotherapy with Dr. Smothers. BX 33 at 2; Tr. I 102. Petitioner continued to receive weekly psychotherapy until August 5, 1998. Tr. I 102. His weekly sessions ended upon the loss of his health insurance. *Id.*

65. When Petitioner first entered treatment with Dr. Smothers in 1996, major depression appeared to be his primary problem. *Id.* 103. Dr. Smothers also diagnosed a personality disorder—narcissistic with dependent features. *Id.*

66. Dr. Smothers placed Petitioner on Wellbutrin, an antidepressant, and Buspar, an antianxiety medication and antidepressant. BX 33 at 2; Tr. I 112. The medications were discontinued in late 1997, after Petitioner's symptoms went into remission. Tr. I 113. Petitioner also received Restoril to manage his insomnia, which was related to marital difficulties. BX 33 at 2.

67. By June 1998, Petitioner exhibited no active signs of depression. BX 33 at 2; Tr. I 104. Since he began psychotherapy in February 1996, Petitioner has improved in his recognition and acceptance of responsibility. BX 33 at 2. He also has experienced a significant decline in the use of defense mechanisms, and his decision-making ability has improved. *Id.* at 1; Tr. I 105. Rev. Simon testified that Petitioner had made progress by "leaps and bounds." Tr. I 53.

68. Dr. Smothers testified that, in his opinion, Petitioner is fit to return to the practice of law. *Id.* 105. Although Petitioner's skills for coping with stress have improved, Dr. Smothers recommends that Petitioner receive supportive therapy for approximately six to eight months as he reintegrates back into law practice. Tr. I 105, 122. Dr. Ratner supports Dr. Smothers' recommendation that Petitioner receive supportive therapy if he is reinstated. Tr. II 194. Dr. Ratner also recommends a practice monitor. Tr. II 195.

69. Petitioner had marital difficulties stemming from the decline in his health and dissolution of his practice. Petitioner has reconciled with his wife and has undergone marriage counseling.

### E. *Petitioner's Financial Status*

#### a. *Professional Finances*

70. Petitioner was a signatory on his law firm's trust account. Tr. II 107. Between November 30, 1990 and April 30, 1991, the account was overdrawn on 26 separate occasions. BX 22 at 1. In December 1991, Bar Counsel recommended to Petitioner changes in the operation of the account, based upon an audit undertaken by a certified public accountant. BX 22.

71. Between January 1994 and April 1995, Petitioner's law firm operating account was consistently overdrawn, despite the transfer of $164,705 from the law firm's trust account to the operating account. BX 23 at 3. Petitioner was a signatory on the operating account and wrote counter checks on it, but he testified that he was unaware of the number of times that the operating account was overdrawn. Tr. II 107.

72. On or about January 11, 1995, Petitioner's law partner, George Tillerson, wired $300,000 out of the trust account to an investment company in Atlanta, Georgia. BX 23 at 3, 26, 27.[4] Petitioner testi-

4. The Court has ordered Mr. Tillerson suspended from practice in the District of Co-

fied that he had no idea that the funds had been sent out. Tr. II 109. First American Title Insurance Company later sued Petitioner for recovery of the wired funds. BX 25. Petitioner testified that he had notified his partner and the firm that he had agreed to a practice monitor with the Office of Bar Counsel and an audit by a CPA. That notice, he believes, precipitated his partner's $300,000 investment scheme to try to cover trust-account deficits unknown to Petitioner. Tr. I 90–91. The loss of the funds nearly cost a client a parcel of real property near the new football stadium in Maryland. Tr. I 92–93. Petitioner's church, Way of the Cross Church of Christ, advanced him $150,000 to repay the debt to the client. Tr. I 93–94. Petitioner recognizes that Mr. Tillerson took advantage of him, but also that he lapsed in supervising Mr. Tillerson adequately. Tr. I 82–83.

73. The Hearing Committee took evidence on restitution and exerted considerable effort toward specifying what Petitioner has repaid and what he still owes. Because no plan for the remaining restitution was in the evidence before the Board, the Board requested that Petitioner and Bar Counsel supplement and clarify the record on restitution. A copy of Petitioner's Affidavit supplementing the record is attached to this Report and Recommendation.[5]

74. Petitioner has made restitution in the amount of thousands of dollars to clients and doctors since he was suspended. Tr. I 138–39. He estimated the total repaid restitution as of the hearing as $189,000. Tr. I 139. He testified that restitution had forced him into a foreclosure on his home and personal bankruptcy. *Id.* For example, at the time of the hearing, Petitioner had paid $5,000 in restitution to one client (Cornish), $20,000 to another, unnamed client, and $18,000 to Capital City Investment Co. Tr. II 43–44.

75. Petitioner never made restitution to Mr. Madison. Tr. II 40. Petitioner has informed the Board that restitution of $650 will be made to Mr. Madison by May 2001. Petitioner's Affidavit, Jan. 2, 2001 ("Petitioner's Affidavit").

76. Petitioner had paid much of the restitution owed to his client, Jacqueline King, including $1,350 since the hearing. *Id.* He still owes her $1,600, her doctor over $1,500, and a Neurology Center $1,750. He has secured the remaining King obligations with a promissory note that he promises to pay by May 2001. *Id.*

77. Petitioner owes the Gunthrop Estate $4,500. Tr. II 110 11. He is investigating whether this amount was paid out of a settlement. Petitioner's Affidavit.

78. Petitioner owes $2,500 to LeRoy Allen. He has represented to the Board that he will make payments of $150 monthly for four years. *Id.* He owes $4,500 to Joyce Johnson, which he has informed the Board he will pay in monthly installments of $200 for four years. *Id.*

79. Petitioner owed the Circuit Court for Montgomery County, Maryland $90 for a bounced check, but he testified that he had made arrangements to pay the bill. Tr. II 43.

80. At the time of the hearing, Petitioner owed his church approximately

lumbia pursuant to D.C.App. Rule XI, § 3(c). *In re Tillerson,* No. 96–BG–271 (D.C. Nov. 4, 1996). Further disciplinary proceedings await resolution of criminal proceedings against Mr. Tillerson.

5. A more recent submission to the Board, a receipt from Ronald Hughes verifying Petitioner's repayment of $250, also is attached to this Report and Recommendation and has been accepted by the Board as a supplement to Petitioner's affidavit.

$50,000, based upon its loan to assist him in repaying a client who had suffered losses as the result of his partner's theft from the firm's trust account. Tr. I 165, Tr. II 44. At the time of the first hearing in this matter, Petitioner was employed as director of development for Way of the Cross Church of Christ, which is a nationwide organization of 50 churches. He earned $2,000 a month as an independent contractor. Tr. I 33, 50, 143. At the September 1999 hearing, Petitioner testified he was working for the church as a setoff to the money he owed them. In his supplemental submission to the Board, Petitioner has presented convincing proof that the debt to the church has been satisfied.

**b. *Personal Finances***

81. On January 2, 1998, Petitioner filed a voluntary bankruptcy petition with the United States Bankruptcy Court for the District of Maryland. BX C at attachment B; Tr. I 159. Schedule E of the petition reflects that Petitioner owed the Internal Revenue Service ("IRS") $74,649, the Maryland Comptroller of the Treasury $10,175, and the District of Columbia Department of Finance and Revenue $11,668.21. BX C at Attachment B.

82. Petitioner filed his individual 1995, 1996, and 1997 federal tax returns on June 15, 1998. BX C at Attachment D. His 1995 return reflects a balance of $1,463 owed the IRS. BX C at Attachment D. His 1996 and 1997 returns show balances owed of $7,429 and $3,486 respectively. BX C at Attachment D. At the time of the hearing, he had not paid these balances, Tr. I 183 84, and estimated his debt to the IRS as $27,000.

83. Petitioner informed the Board that, as of January 2001, he was in the process of attempting to compromise the debt to the IRS. Petitioner's Affidavit. Petitioner is willing to pay approximately $35,000. *Id.* His church is willing to loan him funds to pay that amount. *Id.*

84. Petitioner filed his individual 1995, 1996, and 1997 Maryland tax returns on June 15, 1998. BX C at Attachment D. His 1995 Maryland return reflects a balance of $812 owed the Comptroller of the Treasury. *Id.* His 1996 and 1997 returns show balances owed of $995 and $825 respectively. *Id.* At the time of the hearing, he had not paid these balances. Tr. I 183–84. At the time of the hearing, Petitioner estimated his debt to the State of Maryland at $7,686 and his debt to the District of Columbia at $11,000.

85. Petitioner informed the Board in January 2001 that he had borrowed funds to pay the Maryland and District of Columbia tax obligations. Petitioner's Affidavit. He is repaying the loan at the rate of $250 per month for three years. *Id.*

**F. *Present Ability To Practice Law***

86. Petitioner has continued to perform legal research, under the supervision of other attorneys. He has drafted motions and memoranda for pending cases and submitted them to the attorneys handling the cases for their use. Tr. II 137.

87. Petitioner has monitored classes at Howard University Law School to stay current in the law. Tr. I 122, 125.

88. Petitioner completed a course in professional responsibility in 1998.

89. Petitioner has learned how to use Lexis and Nexis to conduct legal research.

90. In his supplemental submission to the Board in January 2001, Petitioner clarified his future plans if he is reinstated to the Bar. He plans to work, for approximately one year, for Way of the Cross Church of Christ. During that period, he intends to prepare for private practice through the Bar's law office management

 

and counseling programs. Petitioner has participated in the Lawyers Counseling Program since April 2000. He then intends to enter private practice with Edward Kimmel, Esquire, as an associate.

### *ANALYSIS*

Under D.C.App. R. XI, § 16(d), a petitioner seeking reinstatement must prove, by clear and convincing evidence, (1) "that he has the moral qualifications, competency, and learning in the law required for readmission, and (2) his resumption of the practice of law will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." In *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985), the Court identified five factors that should inform this inquiry:

1. The nature and circumstances of the misconduct for which the attorney was disciplined;
2. Whether the attorney recognizes the seriousness of the misconduct;
3. The attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones;
4. The attorney's present character; and
5. The attorney's present qualifications and competence to practice law.

In addition, the Board must consider whether Petitioner's physical and mental health are sufficiently recovered to permit him to practice law, as the Court directed by its citation to D.C.App. R. XI, § 13(g) in *Roxborough III.* Before addressing each requirement in turn, we note that, in reinstatement matters, the Board should defer to the Hearing Committee's findings of fact where supported by substantial evidence on the record as a whole. Board Rule 13.6. *Accord, In re Lee,* 706 A.2d 1032, 1035 (D.C.1998); *In re Stanton,* 682 A.2d 655, 658 (D.C.1996).

#### 1. *Nature and Circumstances of Misconduct Leading to Discipline*

Petitioner's previous misconduct was serious and repeated. It arose from several distinct incidents and culminated in three decisions by the Court of Appeals that suspended Petitioner with the requirement that he prove his fitness to practice law before reinstatement.[6]

The Board also considers the serious acts of unadjudicated misconduct to which Bar Counsel and Petitioner stipulated. *See* ¶¶ 30–51 of Findings of Fact, above. Pursuant to current practice, Bar Counsel did not further prosecute these matters once the Court imposed a requirement in *Roxborough I* that Respondent demonstrate fitness before reinstatement. *See, e.g., In re Herndon,* 609 A.2d 682 (D.C. 1992)(per curiam). The Board concludes, as has the Court, that it is appropriate for the Court to consider such acts when considering a petition for reinstatement. In *Herndon,* the Court stated that misconduct adjudicated through the Board level could be considered at the time of a petition for reinstatement, although it imposed no separate sanction for those acts. Unadjudicated acts of misconduct should be considered as well. Board Rule 9.8. A reinstatement proceeding is like an admission proceeding, in which the Court is aided by any and all pertinent information about how Petitioner would conduct himself if reinstated to the bar. Certainly further past misconduct is highly relevant to that determination. Moreover, Petitioner has

6. The Hearing Committee attached no independent weight to Petitioner's suspension in Maryland, which the Court addressed in *Roxborough III,* to the extent that it arose from his suspension in the District of Columbia in *Roxborough I.* We agree.

not objected to consideration of the unadjudicated acts of misconduct.

We also are aware, and cannot ignore, that Petitioner's lack of vigilance to the operation of his practice while he could not bring himself to face the impairments in his physical health, and his related mental health issues, created the circumstances in which Mr. Tillerson was able to tamper with client funds, creating very substantial harm to clients. The Hearing Committee found:

> Mr. Roxborough's inability to manage his law firm finances during 1990 and 1991 and again in 1994 and 1995 led Bar Counsel to recommend the appointment of a practice monitor and an audit by a CPA. That appointment, in turn, led Mr. Roxborough's law partner to withdraw $300,000 from the firm's investment account to invest in a scheme to recoup other trust-account deficits of which Mr. Roxborough was unaware. That is, his inattention to law firm finances led, in part, to these present problems.

Hearing Committee Report at 21.

We do recognize that Petitioner stipulated to these other acts, which is to his credit. The stipulations have saved the disciplinary system many hours of effort. We also note a fact that apparently has not surfaced on the record in the course of the disciplinary proceedings against Petitioner. Petitioner aided the effort to prosecute Mr. Tillerson, both in the disciplinary process and in the criminal justice system. Tr. II at 89–90. These efforts went to the extent of sneaking back into his office to take documents for Bar Counsel's use after Mr. Tillerson had the locks on the doors changed, with the result that he was shunned by the personnel remaining in the office. *Id.*

The overall scenario of the dissolution of Petitioner's practice and the attendant misconduct, however, is a very serious one. Petitioner has a high burden to show that he has presented clear and convincing evidence sufficient to establish the other *Roundtree* factors.

### 2. *Petitioner's Recognition of the Seriousness of the Misconduct*

Petitioner's assistance in the prosecution of Mr. Tillerson should not be understood as an effort to deflect responsibility for his own misconduct. To the contrary, at the hearing Petitioner could barely be suppressed from repeatedly describing his own shortcomings and errors. The Hearing Committee obviously was very taken with Petitioner's testimony in this regard.

Petitioner testified during the reinstatement hearing that the handling of the Madison matter (the subject of *Roxborough I*) had been his responsibility and that he had neglected it. Tr. I 75–76. He never has reimbursed Mr. Madison, but testified that he will take steps towards doing so. Tr. II 40. He further testified that he would agree to restitution in the amount of $715 to his client.

With respect to the matters that were the subject of *Roxborough II,* Petitioner confirmed during his testimony that he had used in the complaint in the Rich matter certain information gained in his interview with Mr. Woodard. Tr. II 62. The Hearing Committee credited his testimony that the private detective contacted Woodward without his knowledge. Hearing Committee Report at 4, 19. Petitioner acknowledged that he should have taken further steps to avoid any contact with Woodard. Tr. II 58–59. With respect to the Takeall matter, Petitioner acknowledged that he had handled the case emotionally and unprofessionally. Tr. I 46. He candidly acknowledged that his judgment in this matter lacked the emotional distance that a "disinterested professional" should have provided. Tr. II 56. Petition-

 

er also completed the course on professional responsibility ordered as a result of the case. Tr. II 71. The Hearing Committee concluded that it "believes that Mr. Roxborough fully grasped the nature of his previous misconduct." Hearing Committee Report at 19.

**3. The Attorney's Conduct Since Discipline Was Imposed, *Including Steps To Remedy the Harm Caused by the Misconduct***

The Hearing Committee concluded that Petitioner also has taken financial responsibility for the debts and harms caused by his prior law practice, in that he has repaid, or has undertaken to repay, those clients who suffered financially because of the problems of Petitioner's previous law firm, Roxborough & Tillerson. Hearing Committee Report at 20.

We must consider whether the fact that Petitioner has not completed restitution is a barrier to reinstatement. First, we note that the Court's original orders imposing discipline did not require restitution before reinstatement; the appropriateness of restitution was not finally addressed in connection with the unadjudicated acts of misconduct. While restitution is always an appropriate consideration in weighing the third *Roundtree* factor, the Court at the time of imposing the original discipline did not rule that completed restitution was an absolute prerequisite to reinstatement.

Petitioner testified that he has not earned enough income since he left law practice to be able to pay all of the restitution owed. The Hearing Committee concluded that "Mr. Roxborough credibly testified that he intends to repay the clients and to pay his other debts, as soon as he is able to do so." Hearing Committee Report at 21. The Hearing Committee concluded: "He has taken all the steps that he is capable of taking in making restitution to those who may have been harmed by his misconduct or the misconduct of his former partner." *Id.* at 23.

The Board tested this conclusion by requesting more specific information on Petitioner's plan for restitution of the remaining amounts. The Board took this step because it had concerns based on the record before the Hearing Committee that Petitioner was not well able to identify the amounts that he owes to clients and others. The Hearing Committee developed a list of those obligations, a commendable effort given the rambling character of the evidence on the financial issues. Since the hearing, however, Petitioner has made progress in accomplishing restitution and in figuring out how he will complete the rest, with definite payment schedules and time lines.

Petitioner has provided specific timetables for paying the additional amounts owed to clients and medical providers. By borrowing the money to pay his tax obligations to Maryland and the District of Columbia, and stating the steps he has taken toward a similar arrangement with the IRS, Petitioner wisely has spread out those payments so the pressure of paying the tax authorities will not pre-empt any ability by Petitioner to make progress on restitution.

The Board also puts very substantial weight on Bar Counsel's lack of objection to the restitution plan and to Petitioner's reinstatement while restitution proceeds. Under these circumstances, adherence to the schedule should be a condition of reinstatement, but it should not be absolutely required that restitution is complete before reinstatement. *See In re Kerr,* 675 A.2d 59 (D.C.1996)(per curiam).

**4. *The Attorney's Present Character***

The Hearing Committee

> was struck both by the humility and candor of Mr. Roxborough's testimony. He seems genuinely contrite for his past mistakes while not blaming anyone for them except himself. He has shouldered the blame for some of these events even though substantial, even primary, responsibility for the untoward events may lie with his former partner in the firm. Mr. Roxborough had ample opportunity to blame others for these events and a substantial factual basis for doing so. Nonetheless, he made no effort during his testimony to suggest that the misconduct of others somehow excused his own failings.

Hearing Committee Report at 20.

The Hearing Committee also was impressed with Petitioner's candid discussion of his own physical and mental frailties. He underwent two years of psychotherapy, which has given Petitioner insight into his past problems and some mechanisms for coping with stress. Again, the Committee was struck by Petitioner's demonstration of his understanding of the psychological causes of his previous problems.

5. ***Petitioner's Present Ability to Practice Law***

The Hearing Committee found "that Mr. Roxborough has the present capacity to practice law." Hearing Committee Report at 21. He has served as a paralegal for other lawyers. Tr. I 137. He provided copies of motions and memoranda that he had drafted and provided to the lawyers for whom he had worked. As the Committee heard no evidence about the facts in any of these cases, it found it impossible to determine whether these motions and memoranda were complete or accurate. Hearing Committee Report at 21. However, it found that the memoranda are well-written, well-argued and indistinguishable in overall quality from the kind of written work product that practicing lawyers routinely submit to federal tribunals. Petitioner testified that he had monitored classes at Howard Law School to try to keep current in the law. He completed a course on professional responsibility in 1998. He has learned how to conduct legal research using computerized services such as Lexis. Bar Counsel concedes that Petitioner has the present ability to practice law.

The Hearing Committee also considered the evidence bearing on whether Petitioner has shown fitness as required by D.C.App. R. XI, § 13(g). The Committee heard persuasive testimony from two psychotherapists who had examined Mr. Roxborough. One, Dr. Smothers, had treated Petitioner every week from February 1996 to August 1998. (Petitioner stopped the sessions when his health insurance ran out.) The other, Dr. Ratner, examined Petitioner at the request of Bar Counsel in January and February 1995.

Dr. Ratner, who had examined Petitioner first, diagnosed a moderately severe mental disorder. He portrayed Petitioner as a narcissistic individual with an inflated sense of self-worth. Petitioner also had a depressive disorder, anxiety symptoms, and manic mood swings. Dr. Ratner expressed some doubt that Petitioner would undergo therapy. A year later, Petitioner began therapy with Dr. Smothers. Dr. Smothers diagnosed him as having a personality disorder (narcissistic with dependent features) and major depression. Dr. Smothers prescribed medications for the depression. By 1997, Petitioner's symptoms were in remission and Dr. Smothers discontinued the medications.

Dr. Smothers and Dr. Ratner both testified that they believe that Petitioner is fit to return to the practice of law. Dr. Smothers testified that Petitioner is better able now to cope with stress, although he

 

recommends that Petitioner receive supportive therapy for six to eight months as he returns to law practice. Dr. Ratner reached a similar conclusion.

The Committee noted that Petitioner's testimony demonstrated his acceptance of his previous mental problems and showed his acceptance of the need to understand the sources of his own stress and to control them. He testified without contradiction to an improved relationship with his wife and to his own willingness to accept responsibility for his failings and to avoid circumstances that might trigger problems for him. The Committee found him to be candid and forthright about his own mental health issues and credited the testimony of the doctors about his rehabilitation.

Petitioner also suffered from glaucoma. In 1995, he underwent laser surgery to repair it but lost most of the vision in his left eye. He has moderate myopia in his right eye. He nonetheless has learned to cope with these vision problems by completing a training course at the Columbia Lighthouse for the Blind. He also has attended a program sponsored by the Maryland Department of Education for attorneys with vision problems. The Hearing Committee observed that, during the hearing, Petitioner read slowly but correctly from several of the exhibits. It concluded that "Mr. Roxborough recognizes his own limitations and has taken admirable steps to surmount them." Hearing Committee Report at 23.

Petitioner informed the Board that he intends to become general counsel to the Way of the Cross Church of Christ for a year upon reinstatement. Petitioner's Affidavit, Jan. 2, 2001. Although evidence before the Hearing Committee showed that the Church has a Maryland address, Petitioner's Exhibit 7, Petitioner and the Church have assured the Board that the Church is incorporated and located in the District of Columbia, at 9th and D Streets, N.E. Petitioner's Affidavit, Jan. 2, 2001. Bar Counsel states that she has checked on the matters submitted in the supplemental materials offered to the Board and has noted no discrepancies. The Board notes that it is imperative that, if reinstated in the District of Columbia, Petitioner limit his practice to the District of Columbia unless and until he is reinstated elsewhere. (Petitioner testified that he applied for reinstatement in Maryland, but that disciplinary officials there told him to pursue a reinstatement petition here first. Tr. II 79–80.)

### *CONCLUSION*

The Board concludes that this is a close case for reinstatement because of the seriousness of the original misconduct, all of which was related to Petitioner's practice, and the fact that restitution is incomplete. Nonetheless, the Board concludes that, on balance, Petitioner has established, by clear and convincing evidence, the five *Roundtree* factors. The Board recommends reinstatement with the following conditions.

1) That Petitioner implement the restitution plan attached to this Report and Recommendation, and report his progress to Bar Counsel every six months;

2) That Petitioner continue his consultation with the Lawyers' Counseling Committee and Lawyers' Practice Assistance Committee for at least three years after reinstatement, and report to Bar Counsel concerning those consultations every six months; and

3) That Petitioner be under the supervision of a practice monitor to be appointed by the Board for one year following Petitioner's entry of private practice. Petitioner shall inform the Board's Executive Attorney 60 days before undertaking pri-

vate practice so that a practice monitor can be appointed. The practice monitor shall report to the Executive Attorney for the Board every three months.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: *s/Patricia A. Brannan*
Patricia A. Brannan
Chair
DATED: March 12, 2001

All members of the Board concur in this Report and Recommendation.

RECEIVED
-2 2001
Board on Professional Responsibility

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**

**In the Matter of:** )
)
**CLAUDE ROXBOROUGH** ) **Bar Docket No. 139-98**
)
Petitioner. )
)

AFFIDAVIT AS SUPPPLEMENT TO THE RECORD

**I Claude Roxborough, hereby deposes and says that I am petitioning the Bar for reinstatement to active practice. I have taken responsibility for moneys taken as a result of defalcations of the Firm. That there was owing at the time of my hearing before the hearing committee approximately $ 127,640. That since that time I have paid $ 50,000 to the Church. (see Exhibit 2) That $ 3890 was paid to Abe Spencer( a creditor of the firm).Also that $ 1,350 was paid to Jacqueline King ( Client). Therefore the total at present is approximately $77,417. That amount is broken down as follows:**

| Client | amount | owed to | status/plan |
|---|---|---|---|
| Jacqueline King | $1,500 | Dr. Malik | Promissory note to be paid in full May 2001 |
| Jacqueline King | $1,750 | Neurology Center | to be paid in full May 2001 |
| Jacqueline King | $1,350 | Jacqueline King | Paid |
| Jacqueline King | $1,600 | Jacqueline King[1] | to be paid in full May 2001 |
| Viola Gunthip Estate | $4.500 | Estate tax | Investigating w/not it was paid out of settlement[2] |
| Dewey Madison | $ 650 | Dewey Madison | Court ordered restitution will be paid May 2001 |
| Joyce Johnson | $4,500 | Joyce Johnson | Payments of $200to be made monthly for 4years. |
| Leroy Allen | $2,500 | Leroy Allen | Payments of $150to be made monthly for 4years |
| Taxing Authorities | | | |
| IRS | $35,000 | IRS[3] | Offer in Compromise ( to be made/being prepared) Will receive a loan to pay accepted offer from Way of The Cross Church of Christ Inc. |
| Maryland Taxes | $10,567 | MD | Payment of $250 per month for three years loan |
| DC government | $13,500 | DC | Payment of $250 per month for three years\loan |

[1] Jacqueline King and Mrs. King are one and the same person.
[2] Mr. Tillerson owns the building and he and Mrs. Hiller have denied me access to the file.
[3] IRS has advised me that the amount due with penalties and interest is approximately $90,000.00. An offer in compromise has been discussed with the IRS. The IRS will respond in 90 days or sooner to the offer.

In Fields v. Tillerson, 726 A.2d 670, after default Judgment was taken against the firm and Mr. Tillerson, I accepted liability and had my insurance carrier negotiate a settlement in the amount of $90,000. This amount was to have settled the entire matter setting aside the judgment of $275,000 against the firm. $ 75,000 was paid by the insurance carrier. The balance could not be paid timely and the settlement was set aside. In my Bankruptcy, as a adversary matter, I argued that the settlement agreement was still in full force and effect. That $15,000 was all that was due to discharge the entire judgment taken against my former partner and the firm. The Bankruptcy Court discharged me of any further obligations regarding this case.

FUTURE PLANS

Since April , 2000 I have participated in the Lawyers Counseling Program. Ms. Lynn Phillips the Director has been my counselor. These sessions have had a very positive effect. Her program allows me to maintain perspective through the excellent support offered. I intend to utilize all of the support programs for Lawyers, to include management of the Law Office, further counseling, sole practice groups, and monitoring. In mapping out an effective plan I have decided to work approximately, one year for Way of the Cross. During that period I will prepare for private practice through the Bar's programs, especially law office management, private practice group support and continued counseling. Thereafter, I then intend to enter private practice with Edward Kimmel Esq. as an associate.

I intend to stay in the Lawyers Counseling program. We have discussed Monitoring and how that may be helpful to me and an assurance to the public. I will cooperate with anything recommended. The Lawyer counseling program is excellent.

Claude Roxborough

Subscribed and sworn to this 2nd day of January 2003.

Vivian L. Smith
Notary Public
January 31, 2003

RECEIVED

FEB - 6 2001

Board on Professional Responsibility

OFFICE OF BAR COUNSEL

FEB - 6 2001

RECEIVED

RECEIPT

I Ronald Hughes hereby declare and affirm that I am Ronald Hughes who on April 2, 1996 filed a complaint against Claude Roxborough for failing to perform legal services for which I paid him $ 250.00.

Mr. Roxborough's reputation has always been excellent and that is why I sought out his services. I later came to find out that he had stopped practicing because of a disability. Today he paid me the $ 250.00 I had paid him. I still think of him as an honest and sincere man and wish him the best. I also recommend him to continue serving the community as a Lawyer and hope he will take care of himself.

Ronald Hughes

2-6-01

LOAD THIS DIRECTION, THIS SIDE UP

LOAD THIS DIRECTION, THIS SIDE UP