In re Mark M. **HAGER**, Respondent.

**A Member of the Bar of the District of Columbia Court of Appeals.**

No. 01–BG–995.

District of Columbia Court of Appeals.

Argued March 28, 2002.

Decided Dec. 19, 2002.

John T. Rooney, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, and Elizabeth A. Herman, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Hamilton P. Fox, Washington, DC, III for respondent.

Brian Wolfman, Washington, DC, filed a brief for amicus Public Citizen Litigation Group.

James C. Turner filed a brief for amicus Halt, Inc.

Before STEADMAN, FARRELL and RUIZ, Associate Judges.

STEADMAN, Associate J.:

Briefly put, the issue in this bar disciplinary proceeding is whether an attorney may ethically enter into an agreement with an opposing party in which his clients are awarded full purchase price refunds (amid other relief) but where the attorney secretly and without the knowledge of the clients 1) receives (together with his co-counsel) $225,000 as attorneys fees and expenses, 2) agrees never to represent anyone with related claims against the opposing party, and 3) agrees to keep totally confidential and not to disclose to anyone all information learned during his investigations.[1]

Before us is a unanimous report of the Board on Professional Responsibility ("Board") finding that respondent Mark M. Hager, a member of our bar, committed eight violations of our rules of professional conduct by, *inter alia*, entering into the above agreement. The Board recommends that respondent be suspended from the practice of law for one year. The record supports the Board's conclusions regarding the disciplinary violations, and we adopt the recommended sanction with a qualification concerning reinstatement.

## I. Facts

The following statement of facts is adapted from the Hearing Committee's findings as adopted by the Board.[2] Respondent is a member of the District of Columbia Bar, admitted on April 28, 1989. He is a tenured professor of law at a local university, and he engages in a part-time legal practice.

In early 1997, Debra Duke and Erika Littlewood, both health care professionals, contacted respondent. They discussed with him pursuing legal action against

---

1. The opposing party directly bears the costs of the refunds up to $10,000. If the amount of the agreed refunds should exceed that limit, the attorneys would reimburse the opposing party for the difference.

2. Respondent challenges several factual findings made by the Hearing Committee and adopted by the Board. We address his chal-

lenges to the "ultimate" findings, the Board's conclusion that he violated several rules of professional conduct and its corresponding rejection of his defenses, in Section II. As for his challenges to specific factual findings, we are satisfied that they are either supported by substantial evidence or not relevant to resolving the issues raised in Sections II and III.

Warner–Lambert Co. with respect to its head-lice shampoo Nix. According to Duke and Littlewood, Nix was ineffective in eradicating head lice because a Nix-resistant strain of lice had evolved. They had already informed Warner–Lambert of their concerns, but the company had denied that Nix-resistant lice existed, had refused to make labeling changes, and had refused to conduct any scientific studies.

Duke and Littlewood informed respondent that in pursuing their claims their goals would be to protect the public from Nix and to compel Warner–Lambert to change its labeling and advertising. Each woman executed a "Contingent Fee Agreement" with respondent and another attorney, John Traficonte, on or about May 13, 1997 (although Duke viewed respondent as her attorney from February 1997 on). The retainer agreement provided that Traficonte and respondent would "investigate potential bases for a class action suit brought in federal court against the manufacturers and/or suppliers of Nix shampoo, seeking refund of the purchase price, and other damages." It also specified that "one requirement of such a suit [would be] that 100 consumers be joined as class representatives," a condition resulting from respondent's plan to file a federal action under the Magnuson–Moss Warranty Act. See 15 U.S.C § 2310(d)(3)(C) (2000).

Respondent, together with Duke and Littlewood, worked to gather at least 100 claimants. Littlewood created a web site to generate names. She also sent out solicitation letters to pediatricians in Richmond, Virginia. The Roanoke, Virginia CBS affiliate broadcast an interview with Duke, and the *Richmond Times–Dispatch* published an interview with her husband. Names produced by these efforts were forwarded to respondent.

By June 1997, around 50 consumers had become clients and another 40 had expressed interest in joining the class action. Warner–Lambert then contacted Traficonte to begin settlement negotiations. Traficonte conducted the settlement talks alone, but he kept respondent aware of and involved in the negotiations.

In July 1997, respondent told Duke and Littlewood that negotiations with Warner–Lambert had begun. At the end of July, he informed them of an agreement but did not discuss any terms. On July 25, 1997, Littlewood discharged Traficonte and respondent as her attorneys. She asked for a list of current and potential clients, but Traficonte and respondent refused her. They did, however, send her $2,500 for her time and effort. On July 26, Traficonte informed Duke that respondent and he were only seeking refunds from Warner–Lambert and not any other forms of relief. After hearing this, Duke agreed that the attorneys could continue to represent her.

On August 8, 1997, Warner–Lambert, Traficonte and respondent entered into a "Settlement Agreement" without the knowledge of Duke, Littlewood, or any of their clients. The key provisions of the agreement may be summarized as follows:

1. Traficonte and respondent would not assert any Nix-related claims against Warner–Lambert on behalf of anyone, including their current clients.

2. Warner–Lambert would stop asserting Nix was 99% effective. It would add a money-back guarantee on the label. It would also "endeavor to form a panel of scientific experts" to study lice resistance to Nix and "would commit such resources as are reasonably necessary to follow the recommendations of the Panel."

3. Warner–Lambert would provide full purchase price refunds to the 90 consumers who had contacted the attorneys. If the total amount of refunds exceeded $10,000, the attorneys would

reimburse the company for the difference.

4. Warner–Lambert would pay Traficonte and respondent "$225,000 for investigating, developing, preparing, advancing and addressing by negotiation with Warner–Lambert" potential claims concerning Nix.

5. None of the consumers' claims against Warner–Lambert would be released by the settlement.

6. The attorneys agreed "to maintain in strictest confidence, and to keep totally confidential and not to disclose in any manner (whether orally or in any form of writing) to any person or entity, any and all of the facts, legal theories, names of persons or potential lay or expert witnesses or any other information ... which ... was obtained ... as a result of their work in relation to the Litigation."

7. All parties agreed "to maintain in strictest confidence, and to keep totally confidential and not to disclose in any manner the form and content of this Agreement and the obligations set forth hereunder, as well as the existence of the Agreement," except that the lawyers could inform the 90 consumers of:

 (a) their refund rights;

 (b) the change in the 99% effectiveness claim;

 (c) the future money-back guarantee; and

 (d) the scientific panel.

As the Board noted, "[i]t is undisputed that if Respondent and Mr. Traficonte had waived legal fees, Warner–Lambert would not have insisted on confidentiality and would have agreed to the other terms provided in the Settlement Agreement." Traficonte did at one point during negotiations ask that the fee provision not be kept confidential, but Warner–Lambert refused.

On August 26, Traficonte and respondent sent a letter to the 90 consumers that discussed only the settlement terms that the lawyers were allowed to disclose. It did not mention the fact or amount of attorneys' fees, the continuing viability of the consumers' claims, or the attorneys' promises not to bring any Nix-related suits and not to disseminate any Nix-related information. The letter concluded as follows:

> [N]otwithstanding our best efforts, [we] have not assembled 100 consumers willing to agree in writing to function as class representative in a class action regarding [Nix]. Morever, the inherent scientific and legal difficulties in successfully prosecuting such a class action, together with the willingness of Warner–Lambert to make what we consider to be reasonable changes in its marketing of [Nix], have led [us] to the decision to abandon any further efforts in this regard.

Subsequently, Duke received $700 in refunds from Warner–Lambert. On November 20, 1997, she contacted both attorneys and asked if Warner–Lambert had paid them to abandon the representation. They declined to reply, but respondent did state that he had not been acting as Duke's attorney during the settlement negotiations. Then Traficonte, with respondent's knowledge and approval, sent Duke a letter on December 2. The letter said that the attorneys had no obligation to disclose to Duke any fees received from Warner–Lambert or any other confidential settlement terms. Traficonte reminded Duke that the attorneys had never gathered at least 100 clients, as required by the Contingent Fee Agreement. As a result, they believed that they "did not ever represent [Duke] in claims against Warner–Lambert." Traficonte did add that the settlement had not released any of Duke's

claims and that she was free to pursue legal action against Warner–Lambert.

In response, Duke filed a complaint with Bar Counsel concerning only respondent on December 23, 1997.[3] Bar Counsel filed charges that respondent had violated eleven of the District of Columbia Rules of Professional Conduct.[4] After a two-day hearing with five witnesses,[5] the Hearing Committee determined that respondent had violated eight rules and proposed a three-year suspension as sanction.[6] Respondent then filed exceptions to the Hearing Committee Report with the Board. The Board by unanimous vote likewise found that respondent had violated eight ethical rules,[7] but recommended a one-year sanction. Respondent filed timely exceptions with this court to the Board's Report and Recommendation.

 The Board's Report and Recommendation comes to us with a strong presumption in favor of its correctness, and respondent bears a heavy burden to suc-cessfully establish claimed exceptions. This court shall "accept the findings of fact made by the Board unless they are unsup-ported by substantial evidence of record." D.C. Bar R. XI, § 9(g)(1). Furthermore, under that same provision, "we are to adopt the Board's recommended sanction 'unless to do so would foster a tendency toward inconsistent dispositions for compa-rable conduct or would otherwise be un-warranted." *In re Slattery*, 767 A.2d 203, 214 (D.C.2001). The Board is composed both of experienced attorneys versed in the realities of the current practice of law and of carefully selected lay members. Here, that Board was unanimous in finding that respondent committed serious ethical violations, a view also taken by a unani-mous Hearing Committee. While this court of course retains ultimate responsi-bility for the imposition of attorney disci-pline, we are cognizant of the relationship imposed by the cited Bar Rule between the Board's recommendation now before us and our proper role in addressing re-

---

3. Traficonte was not included because he is not a member of the District of Columbia Bar.

4. The charges were Rule 1.2(a) (failure to abide by clients' decisions concerning objectives of representation and/or whether to accept offer of settlement); Rule 1.4(a) (failure to keep clients reasonably informed about status of matter and/or to comply promptly with reasonable requests for information); Rule 1.4(c) (failure to inform clients of settlement offer); Rule 1.6(a)(2) (knowingly using confidence or secret of one or more clients to their disadvantage); Rule 1.7(b)(4) (representing clients in matter where attorney's professional judgment was or reasonably might have been affected by his own interests); Rule 1.8(e) (accepting compensation from someone other than client without client consent, when there is interference in the lawyer's professional judgment or attorney-client relationship and/or no protection of information related to the representation as required by Rule 1.6); Rule 1.16(a) (failure to withdraw from representation when representation involved violation of Rules of Professional Con-duct); Rule 1.16(d) (failure to take steps upon withdrawal of representation to protect clients' interests); Rule 5.6(b) (participating in agreement in which restriction on right to practice was part of settlement of controversy between parties); Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit and/or misrepresentation); and Rule 8.4(d) (engaging in conduct that seriously interfered with administration of justice).

5. Four other witnesses submitted affidavits.

6. The Hearing Committee found that respondent had violated Rules 1.4(a), 1.4(c), 1.7(b)(4), 1.8(e), 1.16(a), 1.16(d), 5.6(b), and 8.4(c) but not 1.2(a), 1.6(a)(2), and 8.4(d). The proposed three-year sanction posited a Rule 8.4(c) violation based on both dishonesty and deceit or misrepresentation.

7. The Board's findings were identical to the Hearing Committee except that the Board found respondent violated Rule 1.2(a) and not 1.4(c).

spondent's exceptions, to which we now turn.

## II. Violations

Respondent contends that Bar Counsel failed to prove by clear and convincing evidence that he violated any Rules of Professional Conduct. We address each ethical violation individually; however, we have grouped them into categories as an aid to understanding. Furthermore, there is a clear interrelationship among the factual underpinnings of the discrete violations, such as the failure to make adequate disclosure to the clients in the face of the conflict of interest.

### A. Conflict of Interest Lacking Client Consent

We begin with the Board's finding that respondent violated Rule 1.7(b)(4): "a lawyer shall not represent a client with respect to a matter if: [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's . . . own financial, business, property, or personal interests." While a client may consent to continued representation in such circumstances, such consent is contingent "upon full disclosure of the nature and existence of the possible conflict and the possible adverse consequences of such representation." R. 1.7(c). No claim is made that such consent was obtained here.

The evidence showed that during negotiations Warner–Lambert offered $225,000 to Traficonte and respondent as long as they promised to keep the fact and amount of payment confidential. If respondent had rejected the confidentiality requirement and had waived his fee instead, his clients still would have received the relief provided by the Settlement Agreement.[8] Nevertheless, respondent agreed to the secret fee payment.

Respondent faced a classic conflict of interest—his interest in maximizing his fee versus his clients' interest in maximizing the amount paid to them. That it occurred in the midst of secret settlement negotiations meant the conflict was even more pronounced.

Any settlement represents a total value figure that one party is willing to pay to end the controversy. Attorneys' fees, even though they may not be technically deducted from the amount paid to the litigants, represent an integral part of the overall amount that the settling party is willing to pay, and as such, they have a direct effect on the net amount that will ultimately be paid to the litigants.

Bloyed v. General Motors Corp., 881 S.W.2d 422, 435–36 (Tex.Ct.App.1994), aff'd, 916 S.W.2d 949 (Tex.1996). See also Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 524 (1st Cir.1991) ("there is . . . a conflict inherent in cases . . . where fees are paid by a quondam adversary from its own funds—the danger being that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-

---

8. The relevant testimony is as follows:

Hearing Committee: I'm correct, am I not, Professor Hager, that you could have waived the fee problem entirely, and that would have taken care of the confidentiality problem?

Respondent: Yes.

Hearing Committee: And you still would have gotten the deal for your clients; you would have gotten the return money guarantee and you would have gotten the scientific panel and the rest [of] it?

Respondent: Yes. It would have been pro bono then.

Hearing Committee: The confidentiality thing results from the fact that you wanted a fee?

Respondent: Yes.

carpet treatment on fees."). Impermissible conflicts of interest have been identified when far fewer dollars were at stake. *See In re Knust*, 598 A.2d 434, 437 (D.C. 1991) (per curiam) (Appendix, Board Report) ($17,000);[9] *In re James*, 452 A.2d 163, 166–67 (D.C.1982) ($40,000), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983).[10]

Nevertheless, this conflict did not, by itself, preclude respondent (through Traficonte) from continuing and concluding the settlement negotiations. For if that were true, plaintiffs' lawyers would find it highly difficult, if not impossible, to engage in any settlement negotiations once the subject of attorney fees had been broached. That clearly is not the case. Rather, what was needed, and what was conspicuously lacking here, was client consent as outlined in Rule 1.7(c). Without such consent, clients would never "have the opportunity to judge and be satisfied" that their attorneys were providing them "wholehearted and zealous representation." As the Board itself noted, "[c]lient review and approval, and court review and approval of class actions settlements, provide a safeguard against attorneys selling their client interests short in order to gain advantage in their fees."

■ Given the potential conflict between respondent's interest with respect to his possible fee and his clients' maximal satisfaction, the Board fairly concluded that his "professional judgment on behalf of [his] client[s] . . . reasonably [would have been] adversely affected by . . . [his] own financial . . . interest." Client consent was therefore required.

Respondent defends his conduct by arguing that no ethical violation occurred because there was no conflict of interest in actuality. According to respondent, he obtained full relief for his clients and "cannot be accused of diverting to [himself], as fees, monies that would otherwise have gone to [his] clients." Indeed, respondent asks us to applaud rather than vilify him for obtaining remedies above and beyond what Magnuson–Moss plaintiffs could have received despite the attorneys' not signing up enough clients and not having any scientific evidence on their side. Put another way, respondent's argument appears to be that no conflict exists where an attorney in fact recovers the maximum relief that a client could recover.

Respondent's theory, though, rests on two unsupportable foundations. First, the Board explicitly refused to say that respondent had obtained full relief, and we see nothing in the evidentiary record that would compel us to say otherwise. As the Board observed, "[d]isciplinary proceedings are ill-suited to be mini-trials on the merits of the clients' potential claims."

■ More importantly, even if respondent's clients did receive full relief in some objective sense through his actions, such a result is irrelevant in deciding whether respondent violated Rule 1.7(b)(4), or any other Rule of Professional Conduct. Obtaining the best possible outcome for one's clients is never a viable defense to charges

9. Because *Knust* was a reciprocal discipline case from Maryland, we did not directly find a conflict of interest. But we did impose the same discipline as the Maryland court that found Knust violated a conflict-of-interest rule (Md. Disciplinary Rule 5–107(A)(1), which governs third-party compensation). *See Attorney Grievance Com. v. Harlan*, 320 Md. 571, 578 A.2d 1196, 1197 (Md.1990).

10. *James* involved a specialized conflict-of-interest rule governing business transactions with clients. *See* 452 A.2d at 167 (discussing Disciplinary Rule 5–104(a), predecessor to Rule 1.8(a)).

of ethical misconduct; the ends do not justify the means.[11] *See In re Fee*, 182 Ariz. 597, 898 P.2d 975, 980 (1995); *People v. Pautler*, 35 P.3d 571, 580 (Colo.Discipl.2001); *In re Mines*, 523 N.W.2d 424, 427 (S.D.1994) ("A practitioner of the legal profession does not have the liberty to flirt with the idea that the end justifies the means .... Certainly our Rules of Professional Conduct allow no such flirtation.").

In our own jurisdiction, *In re Shay*, 749 A.2d 142 (D.C.2000) (per curiam), is also enlightening on this point. In *Shay*, the disciplined attorney represented a husband ("J.C.") and wife ("E.Y."). J.C., however, had never divorced his previous wife, a fact he confided in Shay with the understanding that she would not tell E.Y. Shay then drafted wills for J.C. and E.Y. without telling E.Y. about J.C.'s bigamy, because she was afraid that disclosure or even withdrawal from representation would "result in no wills being drawn, which would leave E.Y. and her baby unprotected in the event of J.C.'s death." 756 A.2d 465, 476 (Appendix, Board Report). The Board took note of Shay's laudable intentions but then proclaimed:

> The conflict of interest rules do not permit a lawyer to be the judge of whether a ... client should be kept in the dark about information that could compromise the lawyer's goal in pursuing the client's interests. The lawyer is a representative, not a principal, in client decisions and transactions. The lawyer has no right to make judgments about what is best for clients who are not fully informed about the facts and their options.

*Id.*

■ This is indeed the fundamental fallacy in respondent's position. It is the client, not the attorney, who decides whether full or acceptable relief has been obtained. The conflict of interest rule in the circumstances here is designed to assure that the attorney pursues the client's objectives as the client views them, unaffected by any personal interest of the attorney in the outcome. Of course an attorney is entitled to obtain reasonable compensation as a result of negotiations, but this must be done within the boundaries of undivided loyalty to client interests.

Besides the Rule 1.7(b)(4) violation, the Board also found that respondent violated Rule 1.8(e), *i.e.*, a third party may compensate an attorney only if: 1) the client consents after consultation; 2) there is no interference with the attorney's professional judgment or the attorney-client relationship; and 3) client confidentiality is protected. As the previous discussion makes clear, the fee settlement interfered with respondent's professional judgment and his relationship with his clients. This was unsurprising, given the problems inherent in a lawyer's accepting payment from an opposing party. *See Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1327 (9th Cir.1999), *cert. denied*, 529 U.S. 1066, 120 S.Ct. 1671, 146 L.Ed.2d 481 (2000) ("A client who employs a lawyer to litigate against a third party has a legitimate interest in having his lawyer refrain from taking the third party's money in exchange for throwing the fight."); *State ex rel. Nixon v. American Tobacco Co.*, 34 S.W.3d 122, 135 (Mo.2000) ("The danger is that the lawyer's own interest will prevail over the client's—or to put it another way, that the lawyer might be unduly influenced

---

11. As *amicus curiae* Public Citizen writes, "the ethical rules do not tolerate the kind of on-and-off regime that [respondent] proposes, which make the rules applicable only where the clients are deemed worse off, based on the results of a retrospective, necessarily subjective cost-benefit analysis."

by an oversized fee to recommend an inadequate settlement for the client."). Rule 1.8(e) protects against just such dangers, yet respondent failed to comply with its mandate.

■ Respondent argues that no violation occurred because his clients indeed consented to the third-party fee arrangement. Respondent points to the following in the Contingent Fee Agreement as proof:

I understand that any attorneys' fees for services rendered regarding the Class Action Claims: (a) will be contingent on a recovery from the defendants, (b) shall not exceed equal to the following agreed maximum percentage of the net amount collected by settlement or trial: 40%; and/or (c) will be approved and/or determined by a court; and/or (d) *will be paid directly by the defendants to the attorneys* and/or paid from the net amount recovered for the entire class. (emphasis added)

■ As the Board observed, the provision is "not a model of clarity." Its obscurity is fatal to respondent's contention. While clients are allowed to waive future conflicts of interest such as third-party compensation, for such a waiver "to be effective ... [it] must contemplate that particular conflict with sufficient clarity so that the client's consent can reasonably be viewed as having been fully informed when it was given." D.C. Bar Legal Ethics Comm., Opinion 289 (1999) (*quoting* ABA Comm. on Ethics and Prof'l Responsibility, Formal Opinion 93–372 (1993)); *see also* D.C. Bar Opinion 309 (2001). We cannot say that the Contingent Fee Agreement outlined "with sufficient clarity" that Warner–Lambert might pay respondent (and his co-counsel) up to $225,000 and that when it did so, respondent would not disclose to his clients the fact or amount of payment. Therefore, the client consent obtained by respondent was inadequate to waive the conflict of interest here.[12]

## B. Communication with Clients

■ The Board found that respondent's failure to inform his clients fully regarding the Settlement Agreement violated two rules of professional conduct. We begin with Rule 1.4(a), which provides in part, "[a] lawyer shall keep a client reasonably informed about the status of a matter."

The evidence showed that respondent did not communicate to his clients many of the critical terms of the Settlement Agreement, including the fee provision, respondent's agreement not to represent any Nix clients against Warner–Lambert, and respondent's agreement not to divulge any information gained during his investigation. Furthermore, the August 26, 1997 letter to his clients did not inform them that the Settlement Agreement was not a release of their claims.

■ The Board found that respondent violated Rule 1.4(a) because he failed to disclose the fee arrangement or the non-release of his clients' claims. We agree that nondisclosure of these terms (as well as the other hidden terms) constituted a violation of Rule 1.4(a). Under Rule 1.4(a), lawyers not only must respond to client inquiries but also must initiate contact to provide information when needed. *See In re Bernstein*, 707 A.2d 371, 376 (D.C.1998); *see also* R. 1.4 cmt. 2. Because respondent withheld important terms from the Settlement Agreement, his clients became unable "to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued." R. 1.4 cmt. 1.

---

12. Respondent also contends that Rule 1.8(e) was not violated because he obtained full relief, an argument we reject for the reasons stated previously.

The Board also found that respondent's communication (and non-communication) with his clients violated Rule 8.4(c), which prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." The Board concluded that respondent had acted dishonestly because he had not disclosed the fee arrangement and his clients' continuing right to sue and he had told Duke in November and December 1997 that he did not represent her during the settlement talks with Warner–Lambert.[13]

We have given a broad interpretation to Rule 8.4(c), as recapitulated recently in *In re Arneja*, 790 A.2d 552, 557 (D.C.2002). "[Dishonesty] encompasses conduct evincing 'a lack of honesty, probity, or integrity in principle; [a] lack of fairness and straightforwardness ...."' *In re Shorter*, 570 A.2d 760, 767–68 (D.C.1990) (per curiam) (citation omitted); *accord, Slattery, supra*, 767 A.2d at 213. *See In re Carlson*, 745 A.2d 257, 258 (D.C.2000) (per curiam) (dishonesty may consist of failure to provide information where there is duty to do so); *In re Jones–Terrell*, 712 A.2d 496, 499–500 (D.C.1998) (violation found despite "lack of evil or corrupt intent"); *In re Reback*, 487 A.2d 235, 239 (D.C.1985) (per curiam), *vacated but adopted and incorporated in relevant part*, 513 A.2d 226 (D.C. 1986) (en banc) (dishonesty in filing second complaint to replace one dismissed because of negligent inattention.). "Dishonesty" is also the most general term in Rule 8.4(c), "encompass[ing] fraudulent, deceitful, or misrepresentative behavior." *In re Wilkins*, 649 A.2d 557, 561 (D.C.1994) (per curiam), but also applying to conduct not covered by the latter three terms, which describe "degrees or kinds of active deception or positive falsehood." *Shorter, supra*, 570 A.2d at 768. Indeed, it has been suggested that sufficiently reckless conduct is enough to sustain a violation of the rule. *Jones–Terrell, supra*, 712 A.2d at 499.

■ We agree that respondent's failure to divulge the fee provision violated Rule 8.4(c). As discussed previously, the significance of a potential defendant's willingness to pay $225,000 in attorney fees would have been lost on no one, least of all the clients themselves. Respondent was "bound to disclose" this to his clients but declined to do so.

■ As for the clients' continuing right to sue, when members of a potential class action learn that the opposing party will provide them refunds *and* their attorneys are dropping their case, it would be only natural for them to wonder if they still have any claims left to pursue. However, respondent declined to assuage their concerns in the August 26, 1997 letter and only informed Duke of her rights after she confronted him three months later.

■ Furthermore, after having told Duke that he did not represent her during the settlement talks, respondent admitted to the Hearing Committee that he had inaccurately described his relationship with Duke. The very first sentence of the Contingent Fee Agreement states, "I hereby retain attorneys John Traficonte ... and Mark Hager ... to perform the legal services described below." Moreover, as respondent himself noted in his brief to this court, Duke received a July 26, 1997 letter that clearly stated that respondent "continue[s] to represent you in the would-be class action against the seller of head lice shampoo." Substantial evidence in the record therefore supports the Board's conclusion that respondent's statements to Duke violated Rule 8.4(c). (We further

---

**13.** The Board also termed part of respondent's conduct as deceitful, a question we need not explore given the finding of dishonesty.

note that the Hearing Committee, who had the opportunity to hear and observe Respondent firsthand, specifically found that all of the above conduct "was intentionally designed by Respondent to dupe [his clients] into believing their interests had been served.")

 Respondent defends himself against these charges by arguing that his (unsuccessful) attempt to convince Warner–Lambert to disclose the fee "negates proof of dishonest state of mind, which a violation of Rule 8.4(c) requires." He also contends that he left out information regarding his clients' continuing right to sue because "it [never] even occurred to [him] that his clients would think they had waived their right to sue." [14] The Board was quite unpersuaded by these contentions, and we can hardly conclude the contrary, given all the circumstances presented in this case. [15]

Finally, regarding the statements to Duke, respondent argues that they were at worst the result of incorrect legal analysis of a clause in the Contingent Fee Agreement. [16] Respondent in effect argues that he engaged in a "conditional" representation of his clients. However, the Board had before it the July 26, 1997 letter to Duke acknowledging the attorney-client relationship and thus substantial evidence in the record supports its finding.

In sum, we are quite satisfied that the Board was justified in the circumstances of this case in concluding that respondent had violated Rule 8.4(c) as we have defined its scope in our holdings.

## C. Proper Conduct During Settlements

The Board found that respondent's participation in the Settlement Agreement violated two rules of professional conduct specific to settlements, Rule 1.2(a), which states in part, "[a] lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter," and Rule 5.6(b), "[a] lawyer shall not participate in offering or making: [a]n agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between parties."

For purposes of these Rules, we focus on the following facets of the Settlement Agreement: 1) respondent agreed not to represent current or future clients in any Nix-related claims against Warner–Lambert; 2) Warner–Lambert agreed that the consumers' claims would not be released;

---

14. Respondent argues that he was not on notice that the Hearing Committee would construe his non-disclosure as an ethical violation. However, the Amended Specification of Charges not only charged violations of Rules 1.4(a) and 8.4(c), but also discussed the Settlement Agreement and several of its terms. Although the clients' continuing rights to sue was not specifically mentioned, we believe that Bar Counsel's highlighting the Settlement Agreement sufficiently alerted respondent that the entire Agreement would be subject to scrutiny for ethical violations. *See Slattery, supra,* 767 A.2d at 208–09; *In re Smith,* 403 A.2d 296, 302 (D.C.1979) Furthermore, while respondent did not testify on this issue, his counsel did have the opportunity to argue it before the Hearing Committee and respond to its questions.

15. The same may be said of respondent's argument that he reluctantly agreed to keep his fee confidential only so he could obtain favorable results for his clients, a variant of his previously rejected "ends justifies the means" defense.

16. "I understand that the attorneys have agreed to represent me and assert claims on my behalf only in the event that such a class action suit may be brought and prosecuted. I understand further that one requirement of such a suit is that 100 consumers be joined as class representatives, and that the attorneys do not now represent 100 such consumers."

and 3) respondent (and Traficonte) signed the Settlement Agreement in their individual capacities and not on behalf of their clients. Respondent argues that the last two provisions mean that no violations occurred, because the agreement is not a "settlement" within the meaning of Rules 1.2(a) ("settlement of a matter") and 5.6(b) ("settlement of a controversy between parties"). *See also* R. 5.6(b) cmt. 2 ("[This Rule] prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client.").

While at first blush it seems incongruous for respondent to argue that a "Settlement Agreement" is not a settlement, the agreement's particular nature raises a meaningful question as to whether these two rules are implicated. As the Board observed, case law is scarce if nonexistent on this issue. The Board concluded that while the clients did not technically waive their rights to sue in the Settlement Agreement (a long-established form of consideration, see, e.g., *4934, Inc. v. District of Columbia Dep't of Empl. Servs.*, 605 A.2d 50, 54 (D.C.1992)), they did lose their attorneys, their attorney's work product and the names of potential class members, which the Board believed was close to the equivalent of a release of their claims. It noted that respondent had also failed to divulge the continuing viability of their claims in the August 26, 1997 letter. Consequently, the Board believed that the Rules governing settlement were implicated by respondent's conduct.

 We concur with the Board's reasoning. This conclusion is strengthened by the weighty reasons behind Rule 5.6(b) in particular:

First, permitting such agreements restricts the access of the public to law-

yers, who by virtue of their background and experience, might be the very best available talent to represent these individuals. Second, the use of such agreements may provide clients with rewards that bear less relationship to the merits of their claims than they do to the desire of the defendant to "buy off" plaintiff's counsel. Third, the offering of such restrictive agreements places the plaintiff's lawyer in a situation where there is conflict between the interests of present clients and those of potential future clients.

ABA Formal Opinion 93–371 (1993).

Given this rationale, we would be reluctant to permit evasion of the strictures of Rule 5.6(b) (or 1.2(a)) by the creation of documents such as the Settlement Agreement, which we reiterate resulted in the clients losing both their lawyers and the work done on their behalf.

We are also persuaded by how other bodies have dealt with scenarios arguably outside the scope of Rule 5.6(b). The Illinois State Bar Association has examined whether a lawyer could agree that an accounting firm would disclose a tax reduction scheme to the lawyer and a client on condition that the lawyer not divulge this information to other clients who would also benefit. The state bar association stated that while such an agreement would not "fall squarely within Rule 5.6 ... [n]onetheless, the restrictions placed on Lawyer's ability to represent other clients similar to Client A in the future without facing a conflict of interest may go to the spirit of Rule 5.6." Illinois State Bar Association, Advisory Opinion 00–01 (2000).[17]

 Similarly, the ABA has evaluated whether Model Rule 5.6(b), which speaks of "settlement of a controversy between *private* parties" (emphasis added), would

---

17. Illinois Rule 5.6 is virtually identical to our Rule 5.6.

still apply if one of the parties was a government entity. Despite the explicit language of the rule, the ABA did not hesitate to find it applicable even when the government was a party. "We conclude, then, that the phrase in question is sensibly to be read as merely descriptive rather than prescriptive: *i.e.*, as referring to the circumstances where such a provision, as a condition of settlement, is most likely to be proposed; rather than as limiting the kinds of settlements to which the prohibition is applicable." ABA Formal Opinion 95–394 (1995). Like the Illinois State Bar Association and the ABA, we believe the protections of Rules 1.2(a) and 5.6(b) are sufficiently important to envelop agreements at the outer fringes of what constitutes a "settlement," and we decline to read our Rules "as limiting the kinds of settlements" such that the Settlement Agreement is beyond their reach.

 Apart from this threshold inquiry of applicability *vel non*, the analysis of whether respondent violated these rules is quite straightforward. "[Rule 1.2(a) ] is designed to preserve the client's right to accept or reject a settlement offer, and it requires that a client be able to exercise his or her judgment at the time a settlement offer is communicated .... [A] client's right to accept or reject a settlement offer is absolute ...." D.C. Bar Opinion 289. Respondent's agreement to terms to be kept secret from his clients and his failure to inform his clients of the terms of the settlement until they were a *fait accompli*, and even then to withhold several material aspects, resulted in his clients never exercising their right to be aware of and to entertain and evaluate the settlement offer. Moreover, the settlement contained a provision directly contravening Rule 5.6(b). "An agreement by the lawyer that he will not represent anyone who has a claim against the settling defendant is clearly a restriction of the lawyer's right to practice law." D.C. Bar Opinion 35; *see also* D.C. Bar Opinion 130 ("[I]t is clear that an attorney, absent special circumstances, cannot ethically accept an arrangement restricting ... his future representation of clients ....").[18] We therefore concur with the Board's conclusion that respondent violated Rules 1.2(a) and 5.6(b).[19]

**18.** We note that several bar opinions have stated that a defense attorney who proposes a restriction on practice provision as part of a settlement also engages in unethical conduct, even if the offer is rejected. *See* D.C. Bar Opinion 130; ABA Formal Opinion 93–371.

**19.** We believe it noteworthy that respondent's conduct touched upon several of the ABA Litigation Section's "Ethical Guidelines for Settlement Negotiations," including 3.1.2 ("The decision whether to pursue settlement discussions belongs to the client. A lawyer should not initiate settlement discussions without authorization from the client."); 3.1.3 Committee Notes ("The client must be given full opportunity to assign priorities to various components of a possible settlement package."); 3.1.4 ("A lawyer must keep the client informed about settlement discussions, and must promptly and fairly report settlement offers, except when the client has direct-ed otherwise."); 3.2.1 ("[A] lawyer must not enter into a final settlement agreement unless either (a) all of the agreement's terms unquestionably fall within the scope of [the lawyer's] authority, or (b) the client specifically consents to the agreement."); 4.2.1 ("A lawyer may not propose, negotiate or agree upon a provision of a settlement agreement that precludes one party's lawyer from representing clients in future litigation against another party."); 4.2.2 ("When an attorney's fee is a subject of settlement negotiations, a lawyer may not subordinate the client's interest in a favorable settlement to the lawyer's interest in the fee."); and 4.2.2 Committee Notes ("A lawyer may not forego other favorable settlement terms in exchange for a favorable fee."). *See* ABA Section of Litigation, *Ethical Guidelines for Settlement Negotiations*. We recognize, however, that the Guidelines were published well after the events in this case had

### D. Withdrawal from Representation

We lastly turn to the Board's findings that respondent violated Rules of Professional Conduct governing an attorney's withdrawal from representation. We first address the Board's conclusion that respondent violated Rule 1.16(d): "In connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled . . . ." [20]

The evidence showed that Littlewood, after she ended her relationship with respondent, requested the names of persons who had agreed to join the class action or had expressed an interest. Respondent refused to provide this information. Soon thereafter, respondent agreed as part of the Settlement Agreement not to reveal any "facts, legal theories, names of persons or potential lay or expert witnesses or any other information . . . obtained . . . as a result of [his] work in relation to the Litigation." No clients apparently requested any of this information from respondent after the Settlement Agreement was executed.

 We agree with the Board that respondent's conduct violated Rule 1.16(d). "This rule unambiguously requires an attorney to surrender a client's file upon termination of the representation." *Bernstein, supra,* 707 A.2d at 375. Respondent's promise to Warner–Lambert to do exactly the opposite significantly impaired his clients' ability to pursue their claims after the representation ended, thus working the very hardship the Rule is designed to protect against. That no clients were in fact denied their files after respondent executed the Settlement Agreement is not determinative. *See In re Landesberg,* 518 A.2d 96, 101 (D.C.1986) (per curiam) (Appendix, Board Report) ("It is settled law that, while lack of prejudice may affect sanction, it has no bearing on the question of violation.").

Respondent's refusal to disclose the client names to Littlewood presents a greater difficulty. Disclosure of a client's identity falls within the scope of Rule 1.6(a)(1): "a lawyer shall not knowingly reveal a confidence or secret of the lawyer's client." The D.C. Bar Committee on Legal Ethics has held that Rule 1.6(a) applies "whenever a client requests nondisclosure of the fact of representation, or circumstances suggest that such disclosure would embarrass or detrimentally affect any client." D.C. Bar Opinion 124; *see also* R. 1.6(b) (" '[S]ecret' refers to . . . information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client.").

In rejecting respondent's confidentiality argument, the Board focused only on the clients' failure to request nondisclosure of their names. "The clients agreed in the Contingent Fee Agreement to be named by the attorneys as class representatives in litigation against Warner–Lambert filed in federal court. The clients had no reason to think that their identities would be secret." While we concur, we believe this reasoning does not address respondent's argument that disclosure would detrimentally affect his other clients because they would not reap the benefits of the (future) Settlement Agreement. As should be

---

taken place and thus they do not control our decision regarding respondent's conduct.

**20.** If a client has not paid fees or expenses, an attorney may retain the work product in a client's file as part of a lien. *See* R. 1.8(i); 1.16(d).

clear by now, any argument that relies upon the virtues of the Settlement Agreement and the need to protect its integrity is a dubious one at best. Furthermore, given their expressed interest in pursuing class action litigation against Warner–Lambert, the other clients may very well have wished for Littlewood to contact them and provide them an alternative to respondent's advocacy efforts. Nevertheless, given the tension between Rule 1.6(a) and Rule 1.16(d), the difficulties in determining whether the other clients would have chosen to disclose their names rather than participate in the Settlement Agreement, and the obviousness of the other Rule 1.16(d) violation, we see no need to decide whether multiple violations of this Rule occurred.

The Board finally determined that respondent violated Rule 1.16(a), which requires that a lawyer withdraw from representation if it will result in violation of the Rules of Professional Conduct. We agree with the Board that respondent violated this Rule by continuing to represent his clients while negotiating a secret fee agreement with Warner–Lambert that violated multiple Rules of Professional Conduct.

### III. Sanction

We turn now to the question of sanction. The Board recommended that respondent receive a one-year suspension. "In determining the appropriate sanction, the Board is to review all relevant factors, including 1) the nature of the violation; 2) the mitigating and aggravating circumstances; 3) the need to protect the public, the courts and the legal profession; and 4) the moral fitness of the attorney." *Slattery, supra,* 767 A.2d at 214. Significantly, whatever level of success respondent achieved for his clients "has no bearing on the severity of the discipline to be imposed." *In re Haar,* 698 A.2d 412, 422 (D.C.1997).

As Section II has made clear, respondent's violations were wide-ranging and included conflicts of interests, dishonesty, improper conduct during settlement negotiations, and failure to protect a client's interests once the representation has ended. In an overall sense, it demonstrated at best an ethical numbness to the integrity of the attorney-client relationship, the very core of the active practice of law. All this "occurred because respondent accorded a higher priority to the collection of his fee than to serving his client or complying with professional standards." *James, supra,* 452 A.2d at 170. As Bar Counsel summed it up to this court:

> [Respondent's] misconduct strikes at the heart of the attorney-client relationship, that is, the trust that clients place in their attorneys to pursue their legal interests. The misconduct encompasses precisely the fear clients have that their attorneys will be "bought off" by opposing counsel, or that their attorneys will use the clients' case to surreptitiously profit from the representation.

At least two additional relevant features are present here. First, respondent has not once appeared to indicate any remorse for his actions or acknowledged the nature of his misconduct, at least prior to the authoritative ruling of this court. *See Shay,* 756 A.2d at 481 (Appendix, Board Report). At every stage of the disciplinary proceedings, he has argued that he did not violate even one Rule of Professional Conduct, a position we find untenable in one with due sensitivity to the bounds of legal ethics. Second, respondent's actions affected an unusually large number of clients. *See In re Ryan,* 670 A.2d 375, 381 (D.C.1996).

On the other hand, there are some mitigating circumstances that the Board took

into account. Respondent has never previously been subject to disciplinary proceedings. *Haar, supra,* 698 A.2d at 422. He has an extensive record of *pro bono* service, and three witnesses testified (and four others submitted affidavits) as to respondent's good character in general. *Id.* Certain ethical violations, such as the Rule 1.2(a) and 5.6(b) violations, are cases of first impression in this jurisdiction (and perhaps nationwide). *Id.*

 After engaging in the above analysis, the Board looked to our prior cases of conflict of interest and dishonesty to fashion an appropriate sanction. With regard to the latter, it determined that respondent's conduct was most comparable to two cases involving such behavior, *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (en banc) and *In re Reback,* 513 A.2d 226 (D.C.1986) (en banc).[21] While the Board noted that these cases have some parallel in the seriousness and deliberateness of the conduct and the potential to undermine public confidence in lawyers, we think the facts of these cases are sufficiently distinct from those here so as not to provide a sufficient guide in themselves. With respect to conflict of interest, "[s]anctions ... have ranged from informal admonitions to lengthy suspensions." *Shay,* 756 A.2d at 483 (citing examples). While, as discussed previously, the matter before us involves a significant conflict of interest, the Board noted that such prior instances of multiyear sanctions had encompassed, among additional violations, the taking of client funds, a grave offense not present here. At bottom, this case presents a congeries of violations that are, as the Board characterized, "very serious" and of a type that may cause "serious public doubt about the integrity of lawyers." On the other hand, there are mitigating circumstances here, including lack of a disciplinary record and respondent's extensive *pro bono* work. While the proposed sanction may well be on the lesser side of the scale,[22] we think the recommended one-year suspension falls within the permissible range of sanctions, and we therefore adopt the Board's recommendation as to the length of the suspension.

However, we do not think that adoption of the Board's proposed sanction concludes this matter. *Amicus curiae* Public Citizen argues, while supporting a one-year suspension, that suspension by itself is insufficient "to maintain the integrity of the profession[,] ... protect the public and the courts, [and] ... deter other attorneys from engaging in similar misconduct." *Reback, supra,* 513 A.2d at 231. It asks what message would be sent if this court disciplined respondent but allowed him to profit from his unethical behavior. Public Citizen therefore urges that respondent be required to disgorge his fee.

 The Board declined to follow Public Citizen's suggestion, reasoning that "disgorgement is not among the sanctions specified in D.C. [Bar] R. XI, § 3(a)." We think the Board did not take a broad enough view of the full range of possible disciplinary actions under our rules. Public Citizen argues that disgorgement should be imposed as a "reasonable condition" of reinstatement under D.C. Bar R. XI, § 3(b). We are inclined to agree. This court has previously relied upon Section 3(b)'s open-endedness to impose spe-

---

**21.** In *Hutchinson,* the attorney had lied under oath to the Securities and Exchange Commission and received a year's suspension. 534 A.2d at 921. In *Reback,* the attorneys had forged their client's signature on a complaint that was then notarized and filed with the court. 487 A.2d at 237. They were suspended for six months. 513 A.2d at 228.

**22.** HALT, Inc., as *amicus curiae,* argues that respondent should be disbarred.

cial reinstatement conditions that are well-matched to particular misconduct. *See In re Roxborough*, 775 A.2d 1063, 1064–65 (D.C.2001) (per curiam) (being supervised by a practice monitor for first year after reinstatement); *In re Bernstein*, 774 A.2d 309, 318–19 (D.C.2001) (completing a professional responsibility course); *In re McConnell*, 667 A.2d 94 (D.C.1995) (per curiam) (attending Alcoholics Anonymous meetings and submitting to random drug testing); *In re Shorter*, 603 A.2d 462, 463 (D.C.1992) (agreeing to monitoring of payment of federal and District of Columbia income taxes). *See also* D.C. Bar R. XI, § 3(b) (passing a professional responsibility exam may be condition of reinstatement).

 Even if restitution as such may not be ordered here,[23] the objective of restitution, preventing unjust enrichment, *see Robertson*, *supra* note 23, 612 A.2d at 1241, underlies disgorgement as well. *See In re Corriea*, 719 A.2d 1234, 1240 (D.C. 1998). Unjust enrichment is no more acceptable simply because a potential defendant and not the clients themselves paid respondent. Furthermore, "[i]t is the general rule ... that where an attorney violates his or her ethical duties to the client, the attorney is not entitled to a fee for his or her services." *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.*, 52 Cal.App.4th 1, 60 Cal.Rptr.2d 207, 215 (1997). It is not a great extension to say that an attorney is not entitled to retain a fee from an opposing party if that payment was the product of multiple ethics violations.

However, several practical problems would present themselves if this court were to order, at this stage of the proceedings, that respondent disgorge his fee. First, the exact amount of the fee respondent personally received is unknown. Also, respondent may be entitled to a reasonable fee for the work he did prior to his unethical conduct. *See Image Tech. Serv. v. Eastman Kodak Co.*, 136 F.3d 1354, 1358 (9th Cir.1998). If so, this amount would need to be determined. Once the final amount to be disgorged was set, interest might then need to be calculated.[24] Then, the proper recipients of the disgorged fee would have to be decided. Should it be the consumers who received refunds, and if so, should both actual and potential clients be included or only the former? Should an alternative recipient, such as the Clients' Security Trust Fund[25] or even a charity, be designated?

 These are all potentially relevant questions, and it may be that other issues will be presented as well. Because of the limited view of the Board of its powers, the evidentiary record before us is inadequate to resolve them at this point. Nor has respondent been afforded the opportunity to address at length the question of appropriate disgorgement. We believe the advisable course of action is to defer final action on the disgorgement issue until the time of reinstatement. *See In re Thomas*, 740 A.2d 538, 546–47 (D.C.1999), *cert. de-*

---

**23.** Because restitution is "a payment by the respondent attorney reimbursing a former client for the money, interest, or thing of value that the client has paid or entrusted to the lawyer in the course of the representation," *In re Robertson*, 612 A.2d 1236, 1240 (D.C.1992), respondent's fee from Warner–Lambert is not technically subject to restitution.

**24.** "The obligation to pay interest is intertwined with the obligation to make restitution." *In re Huber*, 708 A.2d 259, 260 (D.C.), *cert. denied*, 525 U.S. 982, 119 S.Ct. 445, 142 L.Ed.2d 400 (1998).

**25.** The Clients' Security Trust Fund compensates clients who have been financially harmed by their attorneys' misconduct. *See* D.C. Bar R. XII.

*nied,* 529 U.S. 1021, 120 S.Ct. 1425, 146 L.Ed.2d 316 (2000). When respondent seeks to be reinstated, he will need to provide evidence concerning his plans, if any, to disgorge his fee, if he has not done so already. To provide a mechanism to achieve this end, we condition reinstatement upon proof of rehabilitation under D.C. Bar R. XI, § 16(d), with inquiry thereunder primarily directed to the fee disgorgement issue. *Cf. In re Fair,* 780 A.2d 1106, 1116 n. 25 (D.C.2001). Indeed, the fact and circumstances of disgorgement may constitute a heretofore missing recognition and acknowledgment by respondent of the ethical violations involved in his conduct, itself an element of rehabilitation.

Accordingly, it is ORDERED that respondent Mark J. Hager be, and he hereby is, suspended from the practice of law in the District of Columbia for a period of one year, with reinstatement conditioned upon compliance with D.C. Bar R. XI, § 16(d) as set forth above. Respondent's attention is called to the requirements of D.C. Bar R. XI, § 14 and the relationship of compliance therewith to eligibility for reinstatement as provided in D.C. Bar R. XI, § 16(c).